## EXCELSIOR BAKING CO. v. UNITED STATES.
### Civ. No. 2332.

United States District Court

D. Minnesota, Fourth Division.
Jan. 13, 1949.

by Act of April 26, 1929, P.L. 785, § 1, as amended by Act of May 16, 1939, P.L. 144, § 3.

424

Fowler, Youngquist, Furber, Taney & Johnson, of Minneapolis, Minn., for plaintiff.

Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Paul S. McMahon, and

Maurice P. Wolk, Sp. Assts. to Atty. Gen., and John W. Graff, U. S. Atty., of St. Paul, Minn., for defendant.

JOYCE, District Judge.

This is an action for recovery of $5,760.81 representing deficiency income and declared value excess profits taxes and interest paid by the taxpayer for the calendar year 1940.

Excelsior Baking Company, plaintiff herein, is a Minnesota corporation engaged in the bakery business. In 1940, the Company was owned by a Mr. Fewell and John Tappan, Sr. who, together with John Tappan, Jr. and a Mr. Lee, comprised the board of directors. At this time Tappan, Sr. held the position of secretary and managed the business subject to the direction and control of the board of directors. His duties included supervision of the financial end of the business, including the tax work. Tappan, Jr. was designated the treasurer and included in his duties was the conduct of labor relations, in which work he was assisted by his father. Mr. Fewell, president of plaintiff company, was not active in the business and apparently confined himself to attendance at meetings of the board of directors. Mr. Lee, vice-president, was a son-in-law of Mr. Fewell and looked after the latter's interests, but it does not appear whether he performed any active duties in the business.

During the years 1939 and 1940 the taxpayer made wholesale and retail sales in St. Paul and Minneapolis. In carrying on the retail phase of its business, about a hundred driver-salesmen were employed who called upon, and mades sales directly to, housewives. This phase constituted the bulk of its business, and the continued operation of the Company was dependent upon a showing of a profit from retail sales.

The driver-salesmen had been unionized about 1935, and thereafter worked under yearly contracts which ran from October 15th of one year to a like date the following year. In September of 1939, the taxpayer started negotiating for a new contract which was to be effective from October 15, 1939 to October 15, 1940. The union and the employer had difficulty in reaching an agreement and labor relations counsel was engaged by the employer. Negotiations continued until the first part of December at which time the taxpayer agreed to enter into a contract on a trial basis. After operating for a short time under this new contract the taxpayer became convinced of its impracticability. Compliance with its terms resulted in decreased sales and, according to the management, the financial position of the taxpayer was imperiled. Attempts by Tappan, Jr., with the aid of labor counselors, to secure a modification of the contract's terms were unavailing. On this and prior occasions the taxpayer expended between $200 and $500 for the services of a labor attorney.

In the latter part of January, 1940, a friend of Tappan, Jr. called from Florida by telephone and told Tappan that he had become acquainted with a man who he thought could be of assistance in the taxpayer's difficulty with the union. After receiving several calls from this friend, Tappan, Jr., with the approval of the board of directors of the taxpayer, left by plane for Florida on about February 13th. His wife accompanied him on this trip. Five hundred dollars of the amount claimed to have been improperly disallowed by the Commissioner as a deductible business expense represents the amount allegedly authorized by the board of directors to be spent for this trip. However, this amount was entered in the corporate books as a charge to shop expense.

Overholt, the friend who had called Tappan, introduced the latter to a Mr. Bernstein a few days after Tappan's arrival, and at this meeting the nature of the taxpayer's labor problems was explained and discussed. During the course of the next few weeks, Bernstein reported having made several telephone calls but did not disclose to whom the calls were made, nor did he reveal any connection with labor leaders in Minneapolis or St. Paul. Overholt told Tappan nothing about Bernstein except that he was from Detroit, and that he was recommended by friends for whom Bernstein had settled a labor dispute. These friends of Overholt personally recommended Bernstein to Tappan according to the testimony of the latter. Tappan further testified that

he made no inquiry as to Bernstein's occupation, qualifications or business connections. Following Bernstein's report of telephone call which he claimed to have made, Tappan paid him $500 for expenses incurred. Finally, Tappan was advised that Bernstein had contacted persons in Minneapolis who could help the taxpayer and was told that these services would cost between $12,000 and $15,000. When Tappan notified his father by telephone of the proposed costs, the latter told him the amount demanded was too high and to withdraw from further negotiations. However, when told by Bernstein that the offer would be kept open only if payment of $4,000 was made, Tappan, Jr. secured that amount from his wife and paid it to him on March 2nd. No part of the $4,500 paid to Bernstein is claimed as a deductible business expense in this action. Tappan, Jr. testified that this payment of $4,500 was made by him without making any further inquiry as to Bernstein's qualifications or union contacts in Minneapolis. Only at a later date, according to Tappan, Jr. did he learn that Bernstein was a member of the notorious Purple Gang of Detroit.

A few days after paying Bernstein the $4,000, Tappan, Jr. returned to Minneapolis by plane, and on the day of his arrival received a telephone call from a man named Schwartz who said he had been contacted by Bernstein. Within the next day or two, Schwartz and a man named Brown called at the taxpayer's plant and there discussed with Tappan, Jr. and his father the labor difficulties which the taxpayer was experiencing. Several days later, Schwartz returned with a man whom he introduced as Isadore Blumenfeld, but who subsequently identified himself as Kid Cann, a man widely known in Minneapolis as an underworld character. Without inquiring as to the qualifications or business connections of these two men, the taxpayer committed itself to pay $13,000 if a satisfactory modification of the union contract was obtained. The unsavory reputation of the individuals with whom the taxpayer proposed to deal was revealed long before a modification of the contract was secured and before any payments were actually made. There was testimony to the effect that Blumenfeld suggested sending a letter to the national president of the union and the posting of several notices designed to advise the driver-salesmen of the precarious position of their employer. On May 24, 1940, at a time when the contract had less than five months to run, a modification of the union contract was secured.

In part payment for the services rendered by Blumenfeld and Schwartz, a $7,000 check was drawn payable to the taxpayer. This check was cashed and the proceeds wrapped in a newspaper which was then delivered to Schwartz on a Minneapolis street corner. The amount of the check was not promptly entered in the accounts of the taxpayer, and only after two months or more were the books balanced by improperly debiting this amount to sales. Thereafter, the balance due Blumenfeld and Schwartz was accumulated from daily cash receipts, and each month was paid in cash to Schwartz while the latter remained in his automobile outside the taxpayer's place of business. The monthly payments thus made were charged to various expense accounts, but in no instance did an entry in the corporate books reflect the true nature of the payments made. Both Tappan, Jr. and his father deny having instructed anyone as to how these payments should be entered in the accounting records and disclaim any knowledge of the facts until long after the entries were made. They attribute the improper entries solely to the machinations of the chief accountant, who has since died.

The 1939–1940 contract terminated on October 15, 1940, and after the Tappans had made unsuccessful attempts to negotiate a new contract, the services of Blumenfeld and Schwartz were again obtained. For an agreed fee of $3,500 these men undertook to, and did, secure a satisfactory contract with the union. Of this fee, $2,500 was accumulated in 1940 and was claimed as a deductible business expense for that year. Again the entries in the accounting records failed to reflect the true nature of the expenses incurred.

On the basis of these improper and misleading entries in its accounting records, the taxpayer claimed $16,000 in deductible business expense on its 1940 tax returns.

In the summer of 1943 an agent of the Internal Revenue Department made an audit of the taxpayer's books, which revealed the mischarges with respect to Tappan's traveling expenses and payments to Schwartz and Blumenfeld. The agent testified that the Tappans refused to divulge the names of the parties who had received the payments charged to various items of expense other than to designate them "labor racketeers". The Tappans claim to have made full disclosure. A written report, submitted by the agent upon the conclusion of his audit and before this action was instituted, substantiates his version of the investigation. Following the agent's report of the discrepancies in the taxpayer's accounts, the Commissioner of Internal Revenue disallowed, as a deductible business expense, the amount of $16,000 and assessed the taxes involved in the present suit. The additional taxes were paid and the taxpayer filed a claim for refund. When this claim was rejected by the Commissioner, the present action was instituted.

From the foregoing facts, the taxpayer seeks to bring the expenditure of the $16,000 ($500 for travel expense and $15,500 paid to Schwartz and Blumenfeld) within the provisions of 26 U.S.C.A. § 23(a) (1) (A). This section provides that in computing net income there shall be allowed as deductions "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses * * *". Insofar as this section relates to compensation for personal services it has been interpreted by the Treasury Department as follows:

"Treasury Regulation 103, Sec. 19.23(a)–6. Compensation for personal services. Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

"(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances."

We start with the proposition that a taxpayer claiming a deduction from net income under the above Code provision has the burden of showing the deduction to be within the scope of the statute. Davis v. Commissioner of Internal Revenue, 8 Cir., 1945, 151 F.2d 441. Where the Commissioner has assessed taxes, his assessment is presumptively correct and the burden of proof is on the taxpayer to overcome this presumption. Willcuts v. Minnesota Tribune Co., 8 Cir., 1939, 103 F.2d 947. In sustaining this burden, the taxpayer must meet certain tests which are implicit in the language used in Section 23(a) (1) (A). Thus, he must be prepared to prove that the expenditure which is claimed to be deductible was paid or incurred in carrying on a trade or business, that it was both ordinary and necessary, and, where the expenditure represents compensation for personal services, that the amount paid was reasonable and for personal services actually rendered. The Commissioner disallowed the deduction in the present case on the ground that the expenditures "were not an ordinary and necessary business expense". It is the taxpayer's contention that this ground for disallowance did not raise the issue of the reasonableness of its expenditure, and that such issue is not presently before this court. The court disagrees. When the deduction claimed involves compensation for personal services, the requirement that the expenditure be ordinary and necessary comprehends the requirement that it be reasonable in amount. Thus, notwithstanding a contrary rule adopted in J. C. Francesconi & Co. v. Commissioner, 1928, 10 B.T.A. 658, this court will treat the issue of whether the compensation paid was reasonable as properly before it.

Certain of the requirements imposed by the Code before an expenditure can be deducted as a business expense, have been

met. The taxpayer did establish that an expenditure for the purpose alleged was necessary, that the expenditure was made in carrying on a trade or business, and that it was for personal services actually rendered. The serious questions are whether the expenditures were reasonable, ordinary, and in accord with public policy.

■ On the question of whether the taxpayer has sustained its burden of proving the compensation paid to be reasonable, the answer must be in the negative. What constitutes a reasonable compensation for personal services is essentially a question of fact to be determined by the particular facts and circumstances in each case. Miller Mfg. Co. v. Commissioner of Internal Revenue, 4 Cir., 1945, 149 F.2d 421. This is not a case where an unusually high fee has been paid an admitted, or even reputed, expert by a taxpayer acting in the honest belief that circumstances required such services. In this case the payments claimed to be reasonable were made to men without any apparent qualification for the job they were to do. Furthermore, the only evidence of services actually performed had to do with Blumenfeld's suggestions with respect to a letter and the posting of several notices. In determining the reasonableness of the amount expended by the taxpayer in order to obtain men of such qualification to perform such services, the compensation paid must be considered in the light of compensation previously paid by the taxpayer for the services of a labor negotiator. No other criteria are offered or available. In its prior dealings with the union, the taxpayer had secured the services of a lawyer who had a reputation as a labor negotiator. Compensation for this lawyer's services varied in amount from $200 to $500, a far cry from the amount here claimed as reasonable. This difference in the fees paid is accentuated by the difference in qualifications of the men involved. Disreputable men without any apparent qualifications for the job they were hired to do were paid 31 times the maximum amount ever paid to a reputable lawyer with a good reputation as a labor negotiator. In the face of these facts the taxpayer can point only to the necessity of securing relief from the contract terms and the opinion of the taxpayer's management that the expenditure was reasonable to establish the fact of reasonableness. But in showing necessity, the taxpayer has not relieved itself of the burden of meeting the other requirements of Section 23(a) (1) (A). Cf. Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. Nor is the opinion of the taxpayer's management controlling on the question of reasonableness. Were that the sole or controlling test, there would be no occasion for the taxing authorities or the courts to consider the question. In the present case, these factors—necessity and management opinion—are greatly outweighed by the absolute lack of any relationship between the amounts paid in the several instances and the qualifications of, and the services rendered by, the men retained by the taxpayer. Clearly, the taxpayer has failed to sustain its burden of showing the allowance to be reasonable.

The conclusion that the compensation paid was not a "reasonable allowance" is decisive on the taxpayer's right to recover, but the circumstances in this case merit discussion on the issues of whether the expenditures were ordinary, and whether, though ordinary and necessary, their allowance would contravene public policy.

■ Where the issue is whether a particular expenditure is ordinary, the Supreme Court has indicated that the question is purely one of fact. Commissioner v. Heininger, 1943, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171. In the present case the objective sought to be obtained, namely, the securing of a workable union contract, was an ordinary one for any business employing union labor. However, though the result accomplished through the expenditure of the amount now claimed as deductible was one ordinarily sought, the means used to accomplish it were most extraordinary. That the taxpayer considered the expenses extraordinary is apparent from the conduct of its management. A fee was agreed upon which bore no relation to any previous fees for similar services; payment was made in a very surreptitious and unbusinesslike manner; and the amounts paid were mischarged in the corporate accounts. While the Tappans deny having told the taxpayer's accountant how the amounts expended

were to be charged in the books, no satisfactory explanation has been offered as to why the accountant would undertake, of his own volition, to conceal the true nature of the expenditures. The expense was extraordinary and was so treated by the taxpayer.

Finally, the Government claims that the particular facts of this case show that to allow the deduction would be contrary to public policy. The taxpayer, while admitting the unsavory reputation of the men it employed, points to the lack of any proof of misdeeds, and on this point the taxpayer is correct. But that is not to say that other facts may not compel the inference of conduct which would cause an allowance of the deduction to contravene public policy. Unusually high fees paid to men commonly associated with the underworld, and success by such men in a field where the efforts of reputable and qualified men have been unavailing, at least makes suspect the means actually used. The taxpayer does not contend that it could have entered into this transaction with knowledge of the true character of the men with whom it was dealing, and then claim the payments made as a deductible business expense. The Tappans deny such knowledge and there is no affirmative proof to the contrary. However, this does not mean that the uncontradicted testimony of the Tappans must be accepted without question. In this regard, the Supreme Court in Quock Ting v. United States, 1891, 140 U.S. 417, 11 S.Ct. 733, 734, 35 L.Ed. 501, has said:

"Undoubtedly, as a general rule, positive testimony as to a particular fact, uncontradicted by any one, should control the decision of the court; but that rule admits of many exceptions. There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony; and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story."

On this phase of the inquiry, the testimony of Tappan, Jr., as to his dealings with Bernstein is of particular significance. Tappan, Jr. testified that he went to Florida and through a friend contacted a stranger who was recommended by other strangers. He then says he paid this stranger, Bernstein, $4,000 which he obtained from his wife; not, however, to secure any relief from the terms of the contract, but solely to keep Bernstein available for future services. This payment, which in amount must have seemed unusual in view of past dealings with labor negotiators, was made, according to Tappan, Jr., without a single question being asked of Bernstein as to his qualifications, his union contacts, or his business background. In view of the fact that the services for which payment was made were to be performed, if at all, in the future, it is inconceivable that any business man would pay the amount here involved without first assuring himself of the character and responsibility of the recipient. To ask the court to accept this version of the transaction is to attribute to it a credulity which Tappan, Jr. now claims was his in his dealings with Bernstein. From the very beginning, the conduct of the taxpayer's management was consistent with full knowledge of the character and reputation of the men with whom they were dealing. It was not consistent with a belief that the transaction was legitimate. In this situation, where the facts relied upon by the taxpayer to establish its right to a deduction from gross income, raise grave doubts as to whether an allowance would be in accord with public policy, this court believes the taxpayer has failed to sustain its burden of proving the expenditure properly deductible.

For the foregoing reasons, plaintiff's action is dismissed and judgment shall be entered for defendant. Findings of Fact, Conclusions of Law, and Order for Judgment may be submitted, of which this Memorandum Order shall be a part. Exception allowed plaintiff.