KERRIGAN IRON WORKS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19767. Promulgated September 28, 1951.

*Cecil Sims, Esq., W. W. Berry, Esq.,* and *Hilary H. Osborn, Esq.,* for the petitioner.

*S. Earl Heilman, Esq.,* for the respondent.

572

OPINION.

Leech, *Judge:* Our first question relates to the reasonableness of the salary paid by petitioner to its president, Philip Kerrigan, Jr., in the taxable years 1941, 1942, and 1943. In each of those years petitioner paid Kerrigan the sum of $25,000, which amount it claimed as a deduction. In determining the deficiency the respondent disallowed $15,000 in 1941, $12,500 in 1942 and $10,000 in 1943.

What constitutes a reasonable allowance for salary expense is a question of fact under the circumstances of each particular case. *Gem Jewelry Co.* v. *Commissioner*, 165 F. 2d 991, certiorari denied 334 U. S. 846. Where the challenged payment is made to an officer who is the sole owner of the capital stock of the corporation, as in the instant case, the transaction is subjected to rigorous scrutiny.

The record establishes that Kerrigan was petitioner's sole executive. He was responsible for the entire management of the business. He had charge of the sales, the engineering and general supervision of the entire production, including the procurement of materials and the hiring of labor. In addition, he had the responsibility of obtaining the necessary finances and the collection of accounts receivable. Although the rapid growth of petitioner's business in the taxable years was due largely to the impetus of defense contracts, nevertheless Kerrigan's industry, ingenuity and ability to produce efficiently at low cost were principal factors in the procurement for petitioner of the

large volume of war contracts. Kerrigan testified that he devoted 12 to 18 hours per day to the business. Commencing in September 1942, petitioner operated two shifts per day. It also appears that the articles which petitioner produced for the war effort were different from those produced in prewar years. Such fundamental conversion necessarily imposed new burdens upon petitioner's sole executive. While added responsibilities warrant increased compensation, the amount must not be disproportionate to the value of the services rendered.

In support of petitioner's contention that the amount of $25,000 paid to Kerrigan in the taxable years involved should be allowed, it is argued that the salary was fixed by the board of directors; that the War Price Adjustment Board, in determining petitioner's excessive profits in renegotiation proceedings, did not disturb the salary paid to its president; and that we are obligated to accept the opinion testimony of petitioner's expert witnesses, since the respondent offered no witnesses in support of his position.

Ordinarily we hesitate to disagree with the judgment of directors where exercised in an arm's-length transaction. But the fact that the salary was fixed by the board of directors is not persuasive under the circumstances existing here. Philip Kerrigan, Jr., owned all of petitioner's capital stock except two qualifying shares. In addition to Kerrigan, petitioner's board of directors consisted of his brother Frank and his sister Regina. It also appears that during the taxable years involved Regina Kerrigan was a minor and not qualified to act as a director. The corporate law of the State of Tennessee provides that the business of a corporation is to be managed by a board of directors of not less than three directors, all of whom shall be of full age.[1] The presence of Philip Kerrigan, Jr., was therefore necessary to constitute a quorum and his vote was required to adopt a resolution. The courts of Tennessee have held that a director may not vote to fix his own salary. *Harris* v. *Lemming-Harris Agricultural Works*, 43 S. W. 869. Under these circumstances, the action of petitioner's board of directors in fixing Kerrigan's salary is without significance.

Nevertheless, Kerrigan is entitled to receive a reasonable compensation for the services he rendered to petitioner.

The fact that the War Contracts Price Adjustment Board, in its proceedings to renegotiate petitioner's excessive profits, did not adjust the salary petitioner paid Kerrigan, while of some evidentiary value, is not binding upon this Court. Clearly it was not the intent of Congress that a taxpayer who was subjected to renegotiation should be given any preferred treatment in the administration of the revenue laws.

---

[1] Williams Tennessee Code (1934), vol. 3, § 3742.

Nor do we find any merit in petitioner's further contention that we are obligated to accept the opinion of petitioner's expert witnesses as to the reasonableness of the salary paid to Kerrigan, in the absence of such testimony being offered by the respondent. We know of no such rule. *Oswald Co.* v. *Commissioner*, 185 F. 2d 6, certiorari denied 340 U. S. 953.

In the recent case of *Sartor* v. *Arkansas Gas Corp.*, 321 U. S. 620, the Supreme Court, at page 627, said:

In considering the testimony of expert witnesses as to the value of gas leases, this Court through Mr. Justice Cardozo has said: "If they have any probative effect, it is that of expressions of opinion by men familiar with the gas business and its opportunities for profit. But plainly opinions thus offered, even if entitled to some weight, have no such conclusive force that there is error in law in refusing to follow them. This is true of opinion evidence generally, whether addressed to a jury or to a judge or to a statutory board." [Citing cases]

Petitioner offered the testimony of three experts, who expressed the opinion that the salary paid to petitioner's executive in the taxable years was reasonable. W. J. Diehl is chairman of the board of the Third National Bank of Nashville, Tennessee. It was through this bank that Kerrigan financed the operations of petitioner in the taxable years involved. When asked the question, "What was your judgment as to the reasonableness or the unreasonabless of Mr. Kerrigan's salary?" he replied, "We accepted it as being reasonable."

C. H. Maltby, a senior vice-president of the Lincoln National Bank of Syracuse, New York, became connected with the Government in October 1942. In June 1944 he became chairman of the Price Adjustment Board for the South Atlantic Division, Corps of Engineers, at Atlanta. The petitioner was then under investigation by that office with respect to renegotiation for 1943, an analysis having already been made for the year 1942. His opinion as to the reasonableness of Kerrigan's salary was based on the testimony which Kerrigan gave at the hearing of this proceeding. It does not appear that Maltby had ever visited the plant of petitioner or had any personal contact with Kerrigan during the taxable years.

George P. Rice, a civil engineer, was commissioned as an officer in the Corps of Engineers, A. U. S., and was assigned as Chief of the Engineering Branch of the Construction Division of the Southwest Pacific area. In August 1944 Rice became a negotiator with the Price Adjustment Board for the South Atlantic Division, under Maltby. His testimony was taken by deposition and his opinion as to the reasonableness of Kerrigan's salary was in answer to a hypothetical question.

Upon the basis of the entire record, giving due consideration to the fact that Kerrigan was the sole owner of petitioner, that no dividends were paid, and that Kerrigan was the sole executive, and to his industry, experience, ability, the long hours he devoted to the business,

the added responsibility imposed upon him in successfully producing for the war effort, and the amount of petitioner's net earnings and sales and according due weight to the opinions of the expert witnesses and all other relevant factors, we have found as a fact a reasonable compensation for the services which Kerrigan rendered to petitioner in the taxable years 1941, 1942, and 1943 to be the respective amounts of $15,000, $20,000, and $25,000. We hold such amounts to constitute ordinary and necessary business expenses, deductible in the respective taxable years under section 23 (a) (1) (A) of the Internal Revenue Code.

The second issue involves the question of the amounts petitioner is entitled to deduct in the taxable years 1942 and 1943 as rental for the use of certain trucks owned by Kerrigan and leased to petitioner.

In 1942 Philip Kerrigan, Jr., rented to petitioner a ½-ton truck and a 1½-ton truck. The latter was purchased early in 1942. Kerrigan had no written lease or agreement as to a fixed rental, but charged petitioner what he thought it would cost the latter for cartage by commercial companies. In 1942 petitioner paid Kerrigan as rental for the use of such trucks the sum of $5,590.91. This transaction was not one entered into at arm's length. Nevertheless we think petitioner is entitled to a deduction of an amount approximating what it would be required to pay commercial companies for similar services.

The record shows that the Office of Price Administration had established a regulation fixing the base rental to be charged for various types of trucks. The rate fixed for trucks of the type here in question was $85 for the ½-ton truck and $150 for the 1½-ton truck, on the basis of a 30-day month of 240 hours. Petitioner's plant was operated on a 24-day work month, so that the proportionate rate would be four-fifths of $85 and $150, or $68 per month for the ½-ton truck and $120 for the 1½-ton truck. The ½-ton truck was available for the entire year, so that the base rental would be $816 ($68 x 12). The 1½-ton truck was purchased early in 1942, and on a basis of 8 months the base rental for such truck would be $960 ($120 x 8). The total rental for the two trucks would be $1,776. It is stipulated that Kerrigan expended for drivers, operation, maintenance, repairs, insurance, etc., the sum of $3,152.26 in 1942. The base rental of $1,776, plus the expenses of $3,152.26, makes a total of $4,928.26, which amount we have found as a fact was the reasonable rental value of the two trucks used by petitioner in 1942.

In the taxable year 1943 Kerrigan leased to petitioner three trucks, the ½-ton truck and two 1½-ton trucks. The latter two trucks Kerrigan had purchased in April 1943. Petitioner paid Kerrigan for the use of the three trucks the sum of $8,906.27. It is stipulated that Kerrigan expended in 1943 for drivers, maintenance, repairs, etc., the sum of $3,357.15. Using the same basis for 1943 that we have above

applied to 1942, the base rental for the ½-ton truck would be $816, and for each of the two 1½-ton trucks the sum of $960, or an aggregate amount of $2,736. The base rental of $2,736, plus the expenses of $3,357.15, makes a grand total of $6,093.15, which amount we have found to be a reasonable rental value for the use of the three trucks in the taxable year 1943. The amounts of $4,928.26 and $6,093.15 constitute ordinary and necessary business expenses of petitioner, deductible in the respective years 1942 and 1943, under section 23 (a) (1) (A) of the Internal Revenue Code.

The third issue presents the question whether the respondent erred in disallowing the amount of $2,282.48 of the $2,750 claimed in 1943 as rental paid to Philip Kerrigan, Jr., for the use of the so-called Northside Plant and certain equipment therein. The respondent contends that the difference between the amount he allowed and the amount claimed by petitioner was in effect a distribution of profits.

In 1943 Philip Kerrigan, Jr., was urged by the Navy to manufacture pontoons. The plant facilities of petitioner were not adequate to enable it to enter into such a contract. Kerrigan was able to locate only one plant in Nashville available and suitable to such production. The plant is known as the Northside Plant. A real estate agent was engaged to negotiate with its then owner for the rental of such plant. The owner was asking a monthly rental of $5,000, which amount was considered absurd by Kerrigan. Later the owner offered to sell, and Kerrigan purchased the plant and its equipment on November 13, 1943, for a total consideration of $57,602.50. Kerrigan did not want to burden petitioner's financial statement with such an obligation, and so arranged with the Third National Bank of Tennessee for a loan and purchased the plant in his individual name. The bank, as a condition to making the loan, insisted that the property be leased to petitioner at a monthly rental of $2,750, and that the lease be assigned to the bank as security. Kerrigan thereupon leased the plant and its equipment to petitioner for 1 year at the monthly rental of $2,750. The contested deduction is for the rental paid by petitioner for the month of December 1943.

The contract with the Navy for the manufacture of pontoons was subject to cancellation at any time, and Kerrigan felt that if the contract was terminated he would not have any need for the plant. He testified that he thought the real property, which was valued at $46,000, would have a resale value of $25,000 in the event the contract was cancelled. In support of the contention that the rent paid by petitioner was reasonable under the circumstances, petitioner offered the opinion of the same three experts heretofore referred to in connection with the reasonableness of Kerrigan's salary and, in addition, the testimony of the real estate agent who negotiated the sale. All of the expert witnesses except Rice expressed the opinion

that the rental of $2,750 per month was reasonable. Rice testified that a reasonable rental would range between $1,500 and $2,500 per month. The respondent offered no witnesses with respect to this issue. At a monthly rental of $2,750, the annual return would be $33,000, which would exceed the maximum amount of risk Kerrigan was assuming in the event of immediate cancellation of the contract by the Navy. We regard such a result as too abnormal to justify our approval, especially since the transaction was between Kerrigan and his solely-owned corporation, and therefore not one entered into at arm's length. We find it rather difficult, in view of the evidence, to evaluate the reasonable rental under the unusual circumstances existing. However, upon considering all relevant factors and giving due weight to the opinions expressed by the expert witnesses, we have found as a fact that a reasonable rental for the month of December 1943 of the Northside Plant and equipment was $1,500.

In so holding, it is to be understood that we are here determining only the reasonable rental for the month of December 1943, which is involved in this proceeding.

We hold that petitioner is entitled to deduct the amount of $1,500 as an ordinary and necessary business expense incurred and paid in the taxable year 1943, under section 23 (a) (1) (A) of the Internal Revenue Code.

The fourth issue presents the question whether the respondent erred in disallowing $2,600 of the amount of $3,400 claimed as a deduction for salary paid to Regina Kerrigan for 8 months of 1943.

The record shows that Regina Kerrigan is a sister of Philip Kerrigan, Jr. In the taxable year 1943 she was 20 years of age. She had served as a director and secretary of petitioner since December 1939. As secretary, Regina Kerrigan signed the corporate minutes dictated by Philip Kerrigan, Jr., and typed by someone else. She had not received any compensation for her services as secretary in the years prior to 1943. The services she rendered as secretary were nominal. After being graduated from school she was employed in the mailing and shipping department of a Nashville department store.

In 1943 Philip Kerrigan, Jr., on occasion detected the smell of whisky on the breath of the superintendent at the River Plant, and he thought it would have a good effect upon the employees in the plant if someone by the name of Kerrigan was in the office. He employed his sister Regina, and fixed her salary at $425 per month, which action was later approved by the directors. Regina's duties while employed at the River Plant were those of a clerk and typist. The other clerical and stenographic help employed by petitioner, with several years' experience, were paid $45 to $50 per week.

Petitioner contends that the amount of $425 was reasonable and should be allowed because it was fixed by the board of directors, who

took into consideration the fact that Regina Kerrigan had not received any compensation for her services rendered as secretary during the period 1939 to May 1943. The record is silent as to what part of the amount fixed as salary was for back salary and what was for services currently rendered. Nor is there any evidence that there was any agreement or understanding that she was to be paid for her services in prior years.

It is well recognized that directors can not legally vote to themselves or other officers compensation for past services where there is no agreement that such officers should be paid. Services must not only be valuable but shall have been rendered with the understanding and intention that they were to be paid for, or under such circumstances as would raise a fair presumption of such intention. *Fitzgerald Construction Co.* v. *Fitzgerald*, 137 U. S. 98, 111; *Church* v. *Harnit*, 35 F. 2d 499. Since the past services rendered by Regina Kerrigan were merely nominal and rendered while still in school or otherwise employed, and being a sister of Philip Kerrigan, sole stockholder of petitioner, we think the fair presumption, under the circumstances, is that it was the intent of all parties that the services were to be gratuitous.

On the basis of this record, we have found as a fact that the reasonable value of the services rendered by Regina Kerrigan for the period of 8 months in the taxable year 1943 is the sum of $1,600. Such amount constitutes a proper deduction for the year 1943, as an ordinary and necessary expense under section 23 (a) (1) (A) of the code.

The final issue involves the propriety of respondent's disallowance of the amount of $500 paid by petitioner to McCarver in 1943 and claimed as a deduction as "Labor Relations Expense."

In 1943 petitioner was having labor troubles. Philip Kerrigan, Jr., was advised to contact one, McCarver, who might be able to help petioner in its labor troubles. McCarver convinced Kerrigan he could help the situation, and Kerrigan paid him the $500 fee he demanded. The labor disturbance did not materialize. The respondent disallowed the entire amount on the ground that the payment was not an ordinary and necessary business expense but was akin to a bribe and against public policy. We sustain the respondent. We think the petitioner has failed to show that this payment was not against public policy. Therefore its deduction as an ordinary and necessary business expense incurred and paid in the taxable year 1943 is denied. See *Excelsior Baking Co.* v. *United States*, 82 F. Supp. 423.

If, in the recomputation under Rule 50, any increase in the deficiency in income tax for the year 1941 is shown to result from the adjustments made in accordance with our decision, such increase is hereby allowed.

*Decision will be entered under Rule 50.*