Utter McKinley Mortuaries v. Commissioner.
Utter McKinley Mortuaries v. Commissioner
Docket No. 26256.
United States Tax Court
1953 Tax Ct. Memo LEXIS 172; 12 T.C.M. (CCH) 814; T.C.M. (RIA) 53253; July 17, 1953
*172 Petitioner's president, who owned or controlled all of its capital stock, leased a mortuary establishment at a minimum rental of $200 a month plus a percentage of gross receipts in excess of $55,200 per year. The leased premises were immediately sublet to petitioner at a flat rental of $1,000 per month on the same terms except an option to purchase at a stated sum was retained by the original lessee. Petitioner deducted $1,000 a month during the taxable years as rent required to be paid as a condition to the continued use and possession of the leased premises. Respondent allowed petitioner to deduct the amounts paid under the terms of the original lease and disallowed the remainder. 1. Held, the amounts that petitioner was required to pay as rent during the taxable years were the amounts allowed by respondent. In 1945 petitioner paid $1,000 to a nonprofit organization in which its president was a founder and life-member, which it deducted as an ordinary and necessary expense. 2. Held, the $1,000 payment was a donation and not an ordinary and necessary business expense. James J. Arditto, Esq., 621 Roosevelt Building, Los Angeles, Calif., for the petitioner. Donald P. *173 Chehock, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion Respondent determined deficiencies for the calendar years 1944 to 1946, inclusive, in the follwoing amounts: Declared
Value Excess-
Excess
Income
Year
Profits Tax
Profits Tax
Tax
1944
$40.05
$10,897.68
None
1945
None
5,214.07
$2,211.30
1946
None
None
6,344.72
For the calendar year 1944, respondent determined an overassessment in income tax in the amount of $2,324.51, which petitioner disputes. Some of the adjustments made by the respondent in determining the deficiencies are conceded by the petitioner. The issues to be decided are: (1) the proper amount of the rentals or other payments that petitioner is entitled to deduct for each of the taxable years under section 23 (a) (1) (A) of the Internal Revenue Code for the use of the East Los Angeles or Coleman mortuary; and (2) whether petitioner is entitled to deduct a payment of $1,000 for the taxable year 1945 to an organization known as Adventures in Business. Under the first issue, petitioner claims deductions of $10,500, $12,000, and $12,000 for the taxable years *174 1944, 1945, and 1946, respectively, of which respondent allowed $2,100, $2,400, and $2,907.60, respectively, and disallowed the remainder. Findings of Fact The petitioner is a California corporation, organized in 1929, with its principal office in Los Angeles, California. During the taxable years and for many years prior thereto, it was engaged in operating mortuaries throughout the County of Los Angeles. It filed its income, declared value excess-profits, and excess profits tax returns for the taxable years with the collector of internal revenue for the sixth district of California. During the taxable years, Maytor H. McKinley owned 75 per cent of petitioner's capital stock and held 25 per cent in trust for his divorced wife. Petitioner's officers and directors during the taxable years were: Officers
Directors
President
Maytor H. McKinley
Maytor H. McKinley
Vice President
Clarence H. McKinley
Clarence H. McKinley
Secretary-Treasurer
C. Paul Bennett
C. Paul Bennett
Secretary-Treas. (1946)
R. H. Ossenbeck
J. L. Larson
E. M. Welch
Clarence H. McKinley received a salary and 12 1/2 per cent of petitioner's net profits during each of the *175 taxable years. C. Paul Bennett received a salary and 12 1/2 per cent of the net profits during the first two taxable years; he left the petitioner in 1946 but came back subsequent thereto. J. L. Larson served as a director of the petitioner at the suggestion of one of Maytor H. McKinley's creditors, Inglewood Park Cemetery Association, and, similarly, E. M. Welch represented another creditor. Petitioner operated its business chiefly from leased mortuaries. In 1939 it operated three mortuaries in leased premises, known as Broadway, Southwest, and West Hollywood. In 1940 and 1941 it leased premises known as Venice and Huntington Park, respectively. In 1944 it leased three additional premises, namely, East Los Angeles, Eagle Rock, and Highland Park, the leases being executed in that order. In 1946 petitioner leased premises in two other locations, namely, Compton and Hollywood. Subsequent to the taxable years, petitioner leased other premises in connection with its business operations. Most of petitioner's leases provided for rentals based upon annual gross receipts. Some leases carried a minimum rental or a percentage of gross receipts, whichever was greater, while others, although *176 based on a percentage of gross receipts, limited the rental to a maximum amount. Most leases provided that the lessee (petitioner) would pay taxes, utilities, insurance, maintenance and repairs in addition to the amounts designated as rentals. None of the aforementioned leased mortuaries had a crematory except East Los Angeles. Late in 1943 and early in 1944, petitioner was seeking a location for a branch of its mortuary business in East Los Angeles. It had considered two mortuaries in that area before negotiations were instituted with Joseph A. Coleman and his wife for the acquisition of their mortuary. Coleman was ill and wished to sell the business and equipment and lease the land and improvements for a minimum rental plus a percentage of the gross receipts. The negotiations were conducted over a period of about three months between Clarence H. McKinley, Maytor H. McKinley, and Joseph A. Coleman and his wife before an agreement was reached. Coleman was interested in leasing for the protection of his wife in the event of his death; but he was unwilling to lease to the petitioner, a corporation, and insisted that the lease run to Maytor H. McKinley, individually. Under date of *177 February 3, 1944, Joseph A. Coleman and Myrtle Agnes Coleman, his wife, entered into an agreement with Maytor H. McKinley, whereby they agreed to sell and Maytor H. McKinley agreed to buy their undertaking and mortuary business, goodwill, and certain personal property, as itemized and attached to the agreement, for the sum of $16,750, which was to be paid concurrently with the execution and delivery to McKinley by the Colemans of the necessary instruments of transfer and conveyance. Under date of February 11, 1944, the Colemans leased the premises in which their business had been conducted to Maytor H. McKinley, individually. The term of the lease was five years with three options to renew, each option being for an additional five-year term. The rental specified was $200 per month plus five per cent of the annual gross receipts from operations under the lease in excess of $55,200. The lessee was authorized to assign the lease but was not released thereby from any of his obligations under the lease. The lease gave the lessee an option to purchase the demised property for a purchase price of $30,750. McKinley promised Coleman that he would not exercise his option to purchase during *178 the lifetime of either Coleman or his wife. Joseph A. Coleman died during February 1946, and his widow received a letter from Maytor H. McKinley stating that he would not exercise his option as long as she lived. The property leased by Maytor H. McKinley from the Colemans was an irregularly shaped lot, with approximately 50 feet frontage on Whittier Boulevard, about 150 feet in depth, tapering to about 30 feet in the rear, improved with a two-story frame building. The first floor of the building had a chapel, organ room, morgue, office, family rooms, and slumber rooms. The upstairs had a showroom and a four-room apartment. The basement contained a crematory with two retorts. In her 1946 return, Myrtle Coleman reported the land and building as having been acquired in 1928 at a cost of $25,000, of which $20,000 was allocated as the cost of the building. Under date of February 15, 1944, Maytor H. McKinley sold and assigned all his interest in the Coleman agreement of February 3, 1944, in consideration of the sum of $16,750. No assignee is named in the instrument of assignment but the minutes of a special meeting of petitioner's board of directors show that petitioner purchased the *179 Coleman funeral business for the exact amount that Maytor H. McKinley paid the Colemans. Such minutes state that petitioner "could not afford to make this capital investment [$16,750], and accordingly Director Maytor McKinley agreed to accept the Company's note with interest at 6% payable one year from date." At such special meeting, the directors also authorized the execution of a lease for the Coleman mortuary and crematory as being in the best interests of the petitioner. Maytor H. McKinley offered to sublease the Coleman premises to the petitioner on the same terms and conditions as his lease with the Colemans except that the sublease would not contain an option to purchase. Petitioner refused a sublease with an unlimited rental based on a percentage of gross receipts which contained no option to purchase. Under date of February 15, 1944, petitioner leased from Maytor H. McKinley the same property which the latter leased from the Colemans. The terms and conditions of petitioner's sublease are the same as the original Coleman lease except that petitioner agreed to pay Maytor H. McKinley a flat monthly rental of $1,000 with no interest in gross receipts, and petitioner did *180 not acquire the option to purchase, which McKinley acquired under his lease. During the taxable years, petitioner realized gross receipts from its operations of leased premises and paid rent thereon as follows (cents omitted): 1944
1945
1946
Gross
Gross
Gross
Leases
Receipts
Rental
Receipts
Rental
Receipts
Rental
Broadway
$238,743
$ 8,400
$260,954
$ 8,400
$264,960
$ 8,400
Southwest
98,205
4,602
100,870
4,498
111,698
5,132
West Hollywood
43,217
3,069
57,714
4,097
59,569
3,656
Venice
64,160
3,600
61,515
3,525
72,451
2,915
Huntington Park
66,130
2,700
73,231
3,356
84,800
3,906
East Los Angeles (Coleman Lease)
32,213
10,500
45,916
12,000
62,536
12,000
Eagle Rock
27,138
5,085
52,033
6,396
53,232
6,396
Highland Park
46,988
8,140
98,907
12,804
109,282
12,804
Compton
11,631
2,666
Hollywood
50,236
11,097
During the taxable years, Maytor H. McKinley paid the Colemans the following sums as rent under his lease: 1944
$2,100.00 (10 1/2 months)
1945
2,400.00
1946
2,907.60 Petitioner furnished the Colemans with a monthly report on the business *181 transacted at the East Los Angeles mortuary and a yearly report at the end of each year showing the amount of their five per cent. At no time material hereto has petitioner operated a crematory. Prior to its acquisition of the Coleman crematory, petitioner sent its cremations to Inglewood Park Cemetery Association. After acquiring a crematory petitioner continued to send its cremations to Ingelewood, with the intention that as long as Inglewood stayed out of the mortuary business it would not operate the crematory. This arrangement, tacit or otherwise, has since continued. In the taxable years, petitioner's cremations amounted to approximately 500 per year for which petitioner paid Inglewood $40 or $50 per cremation. In its income tax returns for the taxable years, petitioner deducted the monthly rental of $1,000 paid to Maytor H. McKinley for the Coleman mortuary. In determining the deficiencies, respondent limited petitioner's deductions for rent on such mortuary to the amounts actually paid the Colemans in each taxable year and disallowed the balance. The rentals paid to the Colemans were the rentals required as a condition to the continued use and possession of the Coleman *182 mortuary; the rentals paid in addition thereto were excessive and were not ordinary and necessary business expenses. In its 1946 income tax return, the petitioner deducted $1,000 as an ordinary and necessary business expense for its payment to a California nonprofit organization known as Adventures in Business, Incorporated. The nonprofit organization was created in April 1946 by a group of public-spirited men to take over the publication of a weekly periodical and expand its service and circulation. Each issue of the periodical dramatized in words and pictures the true story of a successful American businessman based on his individual incentive and independent enterprise. Each of the organizers or founders of the nonprofit organization had established their own business, had been featured in an issue of the weekly periodical, and were convinced that a great deal of good would be accomplished by a wide distribution of these case-histories to schools, universities, and elsewhere. The case-histories were available separately or in annual bound volumes of 52 issues. Each of the organizers or founders contributed, or caused to be contributed, $1,000 in cash, thus becoming life members *183 of the nonprofit organization. Maytor H. McKinley was one of the organizers and founders, and was the executive vice president of the organization in 1946. His business-success story was featured in the periodical's issue of April 19, 1946, and appeared in volume three of "Adventures in Business" which contained the 52 issues from May 18, 1945, to May 10, 1946, inclusive. Petitioner used Maytor H. McKinley's success story as printed in "Adventures in Business" in connection with its advertising and public-relations work in 1946 and subsequent thereto. Petitioner's payment of $1,000 in 1946 to Adventures In Business, Incorporated, was not an ordinary and necessary business expense. Opinion RICE, Judge: Section 23 (a) (1) (A) of the Internal Revenue Code allows deductions in computing net income of "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no *184 equity." [Italics supplied.] With respect to the first issue, petitioner contends that the $1,000 a month rental payments were reasonable for the right to use and occupy the Coleman mortuary, and that it was required to pay such amount for its use and occupancy thereof. Respondent contends that the deductions he allowed the petitioner constitute all the rentals that it was required to pay as a condition to the continued use of the Coleman mortuary, as well as constituting "reasonable" rental for such use. The rule controlling this issue is whether the amounts claimed as rent were, in fact, rent or something else paid under the guise of rents. The inquiry is whether the petitioner was required to pay these amounts as rent. Where the relationship between the lessor and lessee is close with no arm's-length dealing between them, the question of whether the amount paid is reasonable or excessive depends upon what the lessee would have been required to pay a stranger in an arm's-length transaction. Roland P. Place, 17 T.C. 199, 203 (1951), affd. 199 Fed. (2d) 373 (1952), certiorari denied 344 U.S. 927 (1953), and cases therein cited. See also *185 Consolidated Apparel Co., 17 T.C. 1570 (1952), on appeal C.A. 7, November 19, 1952. There can be no doubt on this record that the original lease of the Coleman mortuary was an arm's-length transaction between strangers each striving to drive the best bargain that the circumstances permitted. The Colemans sought and obtain a minimum monthly rental of $200 plus a percentage of gross receipts in excess of $55,200 per year. Coleman, seriously ill, desired an assured monthly income during his and his wife's lifetime. They gave Maytor H. McKinley an option to purchase the leased premises for an agreed sum of $30,750, but exacted a promise from him that the option would not be exercised as long as either of the Colemans survived; and this promise the lessee has faithfully kept. Despite the testimony of petitioner's witnesses to the contrary, this valuation by the contracting parties at which one agreed to sell and the other agreed to buy is, in our opinion, the best evidence of the value of the Coleman premises on February 15, 1944, that the record affords. We have been unable to find a business reason or purpose for the increased rental that Maytor H. McKinley charged his *186 whollyowned or controlled corporation for the Coleman mortuary. One explanation offered for the flat monthly rental of $1,000 is that the corporate directors would not accept a percentage lease that had no maximum rental provision. This explanation ignores the fact that petitioner leased other premises before, during, and after the taxable years with percentage provisions without imposing a maximum, as shown by the various leases which petitioner placed in evidence. We find this explanation unimpressive also for the reason that petitioner's mortuary establishments were so dispersed that each new location would draw some business to it which prior thereto had been handled in one or another of petitioner's establishments, thus reducing the need for a maximum rental figure. This situation was recognized by Maytor H. McKinley in his efforts to explain the omission of a maximum figure on leases subsequent to 1944. Actually, the Coleman mortuary would have had to have an annual gross business of $247,200 before five per cent of its gross receipts in excess of $55,200 plus the $200 per month rental would have amounted to $12,000 per year. With gross receipts for 10 1/2 months of 1944 amounting *187 to only $32,213.71, petitioner was in no immediate danger of reaching a volume of business that would require rental payments of $1,000 per month under the original lease. The only leased premises operated by petitioner during 1945 and 1946 that had a volume of business exceeding $247,200 per annum was Broadway, which had a graduated rent based on gross receipts with a fixed maximum of $700 per month where gross receipts equalled or exceeded $75,000 per year. Petitioner's argument that the board of directors had interests adverse to Maytor H. McKinley which made their acceptance of the lease at a rental of $1,000 per month an arm's-length transaction is ingenious but not persuasive. In the first place, two of the directors on the board represented creditors of Maytor H. McKinley and they could hardly object to a sublease which paid their debtor $1,000 a month when he in turn was obligated to pay out only $200 a month, plus a percentage, which was unimportant without a substantial increase in business. Such an arrangement worked two ways, it helped the corporation taxwise in an excess profits tax year and it put the debtor in funds to pay his obligations to the principals of the two *188 directors. Under such circumstances, one would hardly expect opposition from them. One of the other two directors was a brother of Maytor and held office in the petitioner at Maytor's will. The other director held office under the same conditions, and the fact that both of them held contracts to share in petitioner's profits was not sufficient, in our opinion, to make them obdurate to Maytor's wishes. A further explanation offered for the $1,000 a month rental was the importance to petitioner of having a crematory, which none of its other mortuary establishments possessed. The several witnesses for petitioner insisted that the crematory justified one-half or more of the rental value of the Coleman premises because in a multiple operation such as petitioner's all mortuaries would be able to use the crematory facilities at the Coleman mortuary. Other facts of record, however, directly contradict this explanation. It was the settled policy of petitioner, testified to by three of its principal officers, to stay out of the business of cremating. For years it had sent its cremations to Inglewood Park Cemetery Association and it continued so to do after acquisition of the Coleman crematory. *189 Petitioner, according to its officers, had no intention of entering this portion of the undertaking business unless Inglewood entered the mortuary business in competition with it. We cannot give much weight, therefore, to testimony that the crematory was worth $1,000 a month; or that the witness would pay $2,000 a month for it and make $25,000 or $30,000 a year; or that with the retorts no one would have any chance of losing any money at $1,000 to $1,500 a month. Such testimony obviously contemplated operation of the crematory which petitioner had no intention of doing. It proposed to and did hold the crematory in reserve for future use if the necessity arose. It is interesting to note that petitioner's operations in its leased premises during the taxable years, other than the Coleman's, afford no precedent for the unusual arrangement encountered here. We also note that the rentals on the other premises during the taxable years averaged around four per cent, more or less, of the gross receipts, whereas the rent on the Coleman premises which petitioner seeks to deduct exceeds 32 per cent, 26 per cent, and 19 per cent of the gross receipts for the taxable years 1944, 1945, and 1946, *190 respectively. By way of contrast the rental deductions allowed petitioner by respondent for the Coleman premises represent 6 per cent, 5 per cent, and 4.6 per cent, respectively, of the annual gross receipts of the taxable years, which is more in line with petitioner's business policy, except as to the Coleman lease. Petitioner's contention that the $1,000 per month rental was reasonable under the existing facts and circumstances is not well founded. The close relationship between the sublessor and the petitioner and the obvious effect of reducing taxes which grew out of the lease agreement justify our careful scrutiny of the transaction. Stanwick's, Inc., 15 T.C. 556, 560 (1950), affd. 190 Fed. (2d) 84 (C.A. 4, 1951), and cases therein cited. In the foregoing discussion we have subjected the transaction between Maytor H. McKinley and his wholly controlled corporation to such a scrutiny. In view thereof we cannot agree that the arrangement between them created a legitimate business expense which was deductible in toto under the statute. No event occurred between the execution of the lease by the Colemans to Maytor and his sublease to petitioner which would *191 enhance the value of the property leased and justify such a rental. It is unnecessary in our view of the matter to determine whether the excess payment over the rent required was a gift, a distribution of profits, excessive compensation, unreasonable rentals, or otherwise. It is sufficient for present purposes to hold, as we do, that the amount disallowed by the respondent in the respective taxable years were not required to be made as a condition to the continued use or possession of the Coleman mortuary. Limericks, Inc., 7 T.C. 1129 (1946), affd. 165 Fed. (2d) 483 (C.A. 5, 1948), and cases therein cited. In so holding we have carefully considered the cases relied on by petitioner, including J. H. Robinson Truck Lines, Inc. v. Commissioner, 183 Fed. (2d) 739 (C.A. 5, 1950); Commissioner v. Greenspun, 156 Fed. (2d) 917 (C.A. 5, 1946); Kerrigan Iron Works, Inc., 17 T.C. 566 (1951); Heatbath Corporation, 14 T.C. 332 (1950); Stanley Imerman, 7 T.C. 1030 (1946), but find them to be distinguishable. The second issue is whether petitioner is entitled to deduct a payment of $1,000 to a nonprofit *192 organization as an ordinary and necessary business expense. Petitioner contends that this payment served a business purpose in its advertising and public relation's work. The record indicates that petitioner used reprints of the April 19, 1946, issue on Maytor H. McKinley and the bound volume in which this issue appeared in its advertising and public relation's work. But the $1,000 payment here in question was not paid for reprints or bound volumes. Maytor H. McKinley's own testimony coupled with the statements contained in the bound volume convince us that the $1,000 was paid as a donation to the nonprofit organization. It was not, therefore, an ordinary and necessary business expense of the petitioner, and respondent's disallowance of the deduction is approved. In the pleadings petitioner attempts to raise an issue regarding the amount of an overassessment of income tax for 1944. This Court has no jurisdiction to determine overassessments, Cornelius Cotton Mills, 4 B.T.A. 255 (1926); and this is true even though an excess profits tax deficiency was determined for the same taxable year, Pioneer Parachute Co., 4 T.C. 27 (1944). This proceeding, insofar as *193 it relates to petitioner's income tax liability for 1944, is therefore dismissed for lack of jurisdiction. Decision will be entered for the respondent.