Bedford Sportswear, Inc. v. Commissioner.
Bedford Sportswear, Inc. v. Commissioner
Docket Nos. 38016 and 44980.
United States Tax Court
T.C. Memo 1954-91; 1954 Tax Ct. Memo LEXIS 162; 13 T.C.M. (CCH) 634; T.C.M. (RIA) 54196; June 30, 1954, Filed *162 The amounts which petitioner is entitled to deduct for each of the taxable years as a reasonable allowance for compensation for the services of the heads of petitioner's sales department during each taxable year are determined. Upon the facts: Held, that the 5 per cent less sales expenses "formula" is a proper method for measuring the total net amount of the commissions of the heads of the sales department as compensation for their services during each year. Held, further, that the amounts of the commissions in question were arrived at in good faith and in accordance with a customary method of computing commissions in the trade. Held, further, that the amounts of commissions were reasonable for each year. Joseph Eckhaus, Esq., 51 Chambers Street, New York, N. Y., for the petitioner. William G. O'Neill, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies, for the years set forth below, in income, declared value excess profits, and excess profits taxes, as follows: Declared
Excess
Value Excess
Profits
Year
Income Tax
Profits Tax
Tax
1942
$ 220.11
$18,887.01
$129,277.12
1943
0
913.96
33,765.81
1944
0
2,646.26
54,144.73
1945
0
0
50,428.68
1946
23,545.88
0
0
1947
19,073.37
0
0
1948
16,471.95
0
0
1949
4,847.67
0
0
*163 For the year 1949, the respondent has made claim for increase in the amount of the deficiency in income tax under section 272(e), I.R.C.
The respondent now concedes through stipulations with the petitioner that the petitioner is entitled to a deduction for the year 1942 for labor costs in the amount of $158,348.38, and to a deduction for the year 1947 for "Debster" loans account in the amount of $9,732.07. Effect will be given to these stipulations under Rule 50. The only question to be decided is whether commissions paid by petitioner to the managers of its sales department are deductible as reasonable compensation for services rendered to the petitioner corporation by each of them during the years 1942 through 1949 within the provisions of section 23(a)(1)(A) of the Internal Revenue Code. Findings of Fact The stipulated facts are found accordingly. The stipulation is incorporated herein by this reference. The petitioner filed its returns with the collector for the second district of New York. The petitioner is a corporation organized under the laws of the State of New York. It reports income for taxation on the basis of a *164 calendar year. It keeps its books and reports its income on an accrual basis. During the years in question petitioner was engaged in the manufacture and the sale, at wholesale, of ladies' dresses of the type designated as the "classic" dress. It was one of the leading producers of a low priced tailored dress. Petitioner maintained its office in New York City. Petitioner is referred to hereinafter as Bedford. Joseph Ditzian and Harry Brenner owned all of the stock of the petitioner in equal shares. Ditzian was president of petitioner and Brenner was vice-president. Ditzian was in charge of production. Brenner's duties related to general management and the buying of piece goods. Petitioner paid no dividends on its stock during the years 1942-1949, inclusive. During the taxable years, and before, Bedford's business operations were carried on in three major departments; production, sales, and general management. For several years prior to and up to the end of 1941, Bedford's sales department was in charge of a sales manager, Henry Rosenfeld. He started working for Bedford in 1932. In 1936, Bedford entered into an oral agreement with Rosenfeld pursuant to which he was made sales *165 manager, and his compensation was to be computed each year on the basis of an overriding commission of 5 per cent of net sales less salesmen's commissions, salesmen's traveling expenses, entertainment expenses, and other expenses properly chargeable to the sales department. Rosenfeld was in complete charge of selling the products produced by Bedford. He contacted and developed the largest and most important customers, representing 75 per cent of Bedford's business; he hired and trained salesmen; and he supervised all activities of the sales department. At the end of 1941, Rosenfeld notified Bedford that he intended resigning to go into business for himself, in the same class of business in which Bedford was engaged. Rosenfeld's decision presented a serious problem to Bedford because Harry Brenner had become less active in the business and during Rosenfeld's employment, he had lost contacts with the large buyers of Bedford's customers. Rosenfeld had been very successful as sales manager, he was popular with the buyers for petitioner's customers. Brenner and Ditzian were fearful that Rosenfeld would take a good deal of business away from Bedford and, consequently, they were anxious to *166 find a competent, experienced, and energetic successor to Rosenfeld. Brenner and Ditzian approached two of Bedford's chief salesmen, offering Rosenfeld's job to each of them, but they declined the offers preferring to go with Rosenfeld. Brenner's son, Henry G. Brenner, and Ditzian's son, Irving Ditzian, as well as another son of Brenner, Maurice, were anxious to take over Rosenfeld's work. They had been employed by Bedford for several years; they had been trained by Rosenfeld and had worked in his department as salesmen. It was finally agreed that the three sons would be responsible for the sales department instead of hiring a new sales manager from outside the organization. It was agreed that their compensation would be governed by the same terms as in the agreement of Bedford with Rosenfeld, i.e., as the managers of the sales department, the total compensation would be computed on the basis of an overriding commission of 5 per cent of net sales subject to commissions, less sales expenses. It was agreed by the three sons that each would share in the total commissions thus computed under the agreement as follows: Henry G. Brenner and Irving Ditzian, each, would receive 35 per cent *167 of the total amount computed as the compensation for the sales managers, and Maurice Brenner would receive 30 per cent. This arrangement was carried out from the first part of 1942 until March 1944 when Maurice went into the Army. Thereafter, during each succeeding year, including 1949, Henry G. Brenner (hereinafter called Henry) and Irving Ditzian (hereinafter called Irving) were in charge of the sales department and they shared equally the amount computed each year under the agreement for the compensation of the managers of the sales department. Maurice received an honorable medical discharge from the Army in February 1945 and returned to Bedford, but he requested that his employment should be on the basis of a salesman rather than on the basis of one of the sales managers. He felt that he could not carry the extra responsibility. In the meantime, during 1942, Joseph Ditzian had a heart attack and thereafter he was inactive and limited his activities to those of advisor and consultant. Upon his retirement from active work. Irving's duties were increased to include production and labor relations. Harry Brenner, who was approaching 70, also became less active, and Henry's duties *168 were enlarged to include the buying of piece goods. Harry Brenner continued, however, to be the chief executive of Bedford and advised upon policy matters, buying, and internal administrative affairs. He did not, however, have anything to do with the sales department; it was entirely under the supervision of Henry and Irving. Henry and Irving devoted all of their time and skill to the execution of their work for Bedford, as Maurice did during the time he served as one of the sales managers. They worked with a great deal of energy and aggressiveness to keep Bedford's old customers and to get new ones. They were successful. Bedford's sales increased in 1942 and 1943 above the amount of sales in 1941. Bedford's net sales during the years involved were as follows: Net Sales Subject
Net Sales
to Sales Dept.
Year
Before Job Lots
Commissions
1940
(not shown)
$1,152,000
1941
(not shown)
1,118,000
1942
$1,432,576
1,360,947
1943
2,006,330
1,906,013
1944
2,291,783
2,177,194
1945
2,077,659
1,973,776
1946
2,364,799
2,246,559
1947
2,114,814
2,009,073
1948
2,127,213
2,020,853
1949
1,691,146
1,606,588
The two sales managers of Bedford, *169 Henry and Irving, hired and trained salesmen. Salesmen, under their supervision, covered various cities and sales territories such as: (1) Sales territories; New England, the South, Florida, and the Middle West. (2) Cities: New York, Boston, Philadelphia, Baltimore, Atlanta, Chicago. They built up a successful business with the Fifth Avenue stores, such as Saks Fifth Avenue, Lord and Taylor, Arnold Constable, Russek's, B. Altman, Macy's, Bloomingdales, Jane Engel, Franklin Simon, and McCreery. They also did business with Montgomery Ward, Littman-Subow, Marshall Field (Chicago), and others. Henry, in addition to other work, planned advertisements of Bedford's products for printing in nationally distributed women's fashion magazines such as Vogue, Harpers Bazaar, Glamour, and Charm. He worked with buyers in making up the layout of the advertisements. He contacted and called on buyers. He specialized in getting the patronage of the select Fifth Avenue stores because their patronage practically guaranteed the patronage of concerns outside New York City. He entertained customers. He watched style trends and demands, and had the designers of Bedford adopt the styles indicated. Henry *170 and Irving earned the respect and confidence of the trade. Their contacts with the leading buyers in the trade were highly successful. This was due to their energetic and skillful cooperation in giving buyers what they wanted and what they could sell in large quantities. Servicing of buyers is a very important part of selling. Henry and Irving provided buyers with the highest type of service and gave them every cooperation. Maurice was thoroughly competent in his part of the sales managers' work while he was one of the sales managers. It is customary in the dress industry to pay the chief salesmen or sales managers commissions based on 5 per cent of net sales. Commissions are paid at higher rates, also, 6, 7, and 7 1/2 per cent of net sales. The rate, 5 per cent of net sales, is a customary commission rate in the industry. The so-called "formula" by which the commissions of the sales managers of Bedford were computed, i.e., 5 per cent of net sales less selling expenses properly charged to the sales department, required the making of adjustments at the end of each year for expenses which should be charged either to general overhead or to the sales department. Such adjustments were *171 an inherent part of the system. They were the subject of conferences and compromises at all times, both when Rosenfeld was sales manager, and when Henry, Irving, and Maurice were sales managers. There was nothing unusual or questionable about the making of such adjustments at the end of the year because certain expenses were incurred for borderline purposes and it was necessary to make a fair apportionment or allocation of them between general overhead and the sales department, or to one or the other categories. Petitioner's accountant frequently had to make adjustments in years later than the year of the accrual on the books of a sales department expense for various reasons, some of which related to the termination of employment of salesmen. Expenses which were accrued were not always paid out promptly because a salesman preferred letting his commissions accrue. The accountant of Bedford sometimes made errors, also. The accounting procedures for the business of Bedford was complicated. Henry, Maurice, and Irving reported in their individual returns the entire amounts of their accrued commissions for each of the taxable years and paid tax thereon. Henry, Maurice, and Irving did *172 not draw out the entire amount of their commissions each year. They let accrued commissions accumulate in their individual accounts. In the early part of 1945, some of Bedford's creditors expressed concern over the low capitalization of Bedford. Petitioner's accountant and the two stockholders believed it would be necessary to increase the working capital of Bedford. At first consideration was given to selling stock to Henry, Maurice, and Irving but a price per share could not be agreed upon. As a result of many discussions, Henry, Maurice, and Irving drew out parts of the balances of their accumulated, accrued commissions, and made personal loans to Harry Brenner and Joseph Ditzian, who in turn, made the funds available for use in the business of Bedford. Bedford ceased operations at sometime in 1952 because Henry and Irving decided to go into business for themselves. Changes in the styles of women's dresses to the more casual styles, known as "separates", i.e., skirts and blouses, dictated the decision of Henry and Irving to go into business for themselves. They organized a new business under the name of Heatherlane Corporation. The total amounts of the commissions payable *173 under the 5 per cent "formula" for the services of the sales managers, which were accrued for each of the taxable years, and were deducted by Bedford in its returns, were as follows: Accrued
Commissions of
Year
Sales Managers
1942
$39,566.76
1943
58,184.20
1944
79,407.00
1945
83,697.96
1946
76,842.74
1947
51,497.10
1948
56,202.44
1949
49,292.36
The 5 per cent "formula" for computing the commissions of Henry, Maurice, and Irving was a reasonable, fair, bona fide, and customary method for measuring in each year the annual compensation of the sales managers for the services rendered by each one to petitioner in each year. The total compensation for the services of Henry and Irving for each of the taxable years, and for Maurice during 1942, 1943, and part of 1945, computed under the "formula" was reasonable for each year. The parties have stipulated orally that the following adjustments to the above amounts are necessary with respect to the years 1942-1948: Required
Year
Adjustments
1942
$5,750.00
1943
1,528.07
1944
4,221.00
1945
8,934.30
1946
2,022.25
1947
(4,219.53)
1948
2,074.89
As adjusted, the following *174 amounts represent reasonable amounts of compensation for the three, or the two (as the case may be) sales managers of petitioner for services actually rendered to petitioner by each one during each of the taxable years 1942 through 1948: Adjusted Annual
Compensation
Year
Per Formula
1942
$33,816.73
1943
56,656.13
1944
75,186.00
1945
74,763.66
1946
74,820.49
1947
55,716.63
1948
54,127.55
The petitioner, in its return for 1949, deducted $49,292.36 as compensation for the services during 1949 of the two sales managers, Henry and Irving. This was computed by use of the "formula" involving application of 5 per cent to net sales subject to commissions of the sales managers. The petitioner and the respondent agree that there are additional deductions to be made from $49,292.36, the first amount arrived at by applying 5 per cent to net sales subject to sales managers' commissions. Some of the adjustments which are to be made are for payments in 1949 for accruals of commissions of a salesman. Sid Deutsch, who left Bedford on October 31, 1949, whose commissions are part of the expense of the sales department which properly are to be charged against the *175 sales managers' commissions for 1949. The parties are agreed upon the items which, when deducted from commissions of the sales managers computed at the rate of 5 per cent of net sales, will reduce considerably the deductible amount of the sales managers' commissions for 1949. Effect will be given under Rule 50 to the recomputation of the deductible net amount of the sales managers' commissions for 1949. We find that the amount of the sales managers' commissions for 1949, recomputed to give effect to further deductions of expenses properly chargeable to the sales department for 1949, (a tentative recomputation having been prepared) constitutes reasonable compensation for the services of the two sales managers during 1949. The method of computation used is proper. The amount originally computed for 1949, using the 5 per cent formula, namely, $49,292.36, was a reasonable allowance for computation for the sales managers services, but additional deductions from net sales subject to commissions and other adjustments have been agreed upon in settlement of other issues which are presented by the pleadings which relate to deductions which respondent disallowed for 1943, 1944, 1946, and 1947 *176 for Sid Deutsch's commissions, and for other commissions which were disallowed for 1944. Under the 5 per cent of net sales "formula", the total amounts of the commissions of the heads of the sales department of Bedford, namely, Rosenfeld during the years 1939, 1940, and 1941, and those who were the heads of the sales department during the years 1942 through 1949, after deducting expenses charged to the sales department, were less than 5 per cent of net sales; they were about the percentages which the following schedule shows: Percentage of
Net Commissions
Year
Paid to Net Sales
1939
.038
1940
.032
1941
.032
1942
.027
1943
.028
1944
.035
1945
.034
1946
.034
1947
.024
1948
.026
1949
.029
Opinion The question arises under section 23(a)(1)(A) of the Code. What amount constitutes a reasonable allowance for the services of petitioner's sales managers in each of the taxable years is a question of fact. L. & C. Mayers Co. v. Commissioner, 131 Fed. (2d) 309; certiorari denied, 318 U.S. 773. What constitutes a reasonable allowance for salary expense depends upon the facts of each case. Gem Jewelry Co. v. Commissioner, 165 Fed. (2d) 991, *177 certiorari denied, 334 U.S. 846. Where the challenged payments are made to members of the families who own and control an incorporated business, as here, the arrangements are subjected to close scrutiny. Also, where a corporation has not paid dividends on its stock during the taxable years and the compensation is payable to members of a family which controls the corporation, the transactions are subjected to close scrutiny. Kerrigan Iron Works, Inc., 17 T.C. 566, 574. The evidence shows that in the trade to which petitioner belongs it is customary to fix the compensation of sales managers and salesmen by using an agreed percentage and applying it to net sales, and that the customary percentage ranges from 5 to 7 1/2 per cent of net sales. Also, petitioner had paid its sales manager, Rosenfeld, 5 per cent of the net sales of the sales department. He was not related to petitioner's stockholders and he was quite young. Petitioner simply continued the same arrangement when it promoted Henry, Maurice, and Irving from the jobs they held as salesmen to the job of managing the sales department, except that the result of a computation of 5 per cent of sales less *178 expenses chargeable to the department, was to be divided among (or between) the three (or two) sales managers. The arrangement made in 1942 with the sons of the stockholders was, therefore, a customary arrangement. All of the record has been carefully considered. It is concluded and found that the method used in computing the annual compensation of the sales managers, that is, the so-called 5 per cent "formula", was proper, bona fide, and reasonable. It is concluded also, that the conduct of the officers and of the sales managers in each year, under the agreement dealing with compensation, was bona fide. We have considered the point that Henry, Irving, and Maurice did not withdraw in each year the entire amounts of accrued compensation which was credited on the books to them. That fact, absent proof of collusion and bad faith, does not militate against petitioner. Payments were made to each sales manager of the accrued balances of compensation. Also, each reported the full amount of his compensation for each year in his individual income tax return. The sons of the stockholders, in 1945, made loans to the two stockholders for use in petitioner's business. Petitioner's business *179 had reached a very large volume and its credit position was improved by the loans. The question under this aspect of this case is whether bona fide loans were made by Henry, Irving, and Maurice to Harry Brenner and Joseph Ditzian. Upon the entire record, we conclude that loans were made; that Harry Brenner and Joseph Ditzian were obligated to make repayment; and that at the time the loans were made both the lenders and the borrowers intended that the sums advanced were to be and would be repaid. We are satisfied that the compensation in each year of each sales manager was not a disguise for distribution of net profits. Cf. Botany Worsted Mills v. United States 278 U.S. 282. Henry, Irving, and Maurice were not stockholders. There is no proof of collusion between them and the stockholders to carry out a scheme of making any "kick-backs" out of purported commissions to the stockholders in order to effect a distribution of dividends on stock to the stockholders. The petitioner presented a great deal of testimony of buyers of Fifth Avenue stores who dealt with Henry, Irving, and Maurice. It has been clearly shown that each of the individuals promoted, facilitated, and *180 serviced sales in very large amounts, and that the work of each contributed materially to building up and retaining the patronage and good will of the largest customers. Respondent apparently contends that the increases in petitioner's business each year was the fortuitous result of general business conditions rather than of the efforts and ability of the individuals in question. We do not agree with that contention. Petitioner was engaged in a competitive business in which production, service, and personal ability are directly related to the success of the business. The record shows that Henry, Irving and Maurice, rendered services to petitioner involving skill and long hours of work, and we are satisfied that their work contributed substantially to the large volume of petitioner's sales in each year. Cf. Ecco High Frequency Corp. v. Commissioner, 167 Fed. (2d) 583. It has been held frequently that the fixing of compensation for services on the basis of an agreed percentage of earnings or sales does not prevent the total amount paid by the employer from constituting reasonable compensation for services. See: Wm. S. Gray & Co. v. United States, 35 Fed. (2d) 968; *181 J. D. Van Hooser & Co. v. Glenn, 50 Fed. Supp. 279, 285; R. P. Farnsworth & Co., Inc. v. Commissioner, 203 Fed. (2d) 490. It is, of course, a question of proof of reasonableness of amount for payment for services actually rendered. See: J. H. Robinson Truck Lines, Inc. v. Commissioner, 183 Fed. (2d) 739; Mayson Mfg. Co. v. Commissioner, 178 Fed. (2d) 115; Wright-Bernet, Inc. v. Commissioner, 172 Fed. (2d) 343; Consolidated Apparel Co., 17 T.C. 1570, 1579, 1580; reversed on other issues, 207 Fed. (2d) 580; and Faucette Co., Inc., 17 T.C. 187, 196. The respondent also disallowed deductions for 1943, 1944, 1946, and 1947 for other commissions, most of which were commissions of a salesman, Sid Deutsch, which were accrued in the above years. Sid Deutsch left Bedford on October 31, 1949. A settlement was made with Deutsch before he left by which payments were made to him in 1949 for accrued commissions which he had not withdrawn. The pleadings present issues raising questions about the correctness of respondent's disallowances of these other commissions. The parties have settled these *182 issues by oral agreement. The parties now agree that the questions about the deductibility of the other commissions are essentially part of the first, or main, issue in these proceedings. The adjustments in the amounts of the deductible commissions of Henry and Irving (and of Maurice in the first three years), computed under the 5 per cent "formula" reflect the agreement of the parties as to the proper treatment of the other commissions. It follows that no additional, or separate, deductions are to be allowed for the commissions of Sid Deutsch since they now are taken care of in the adjustment figures which are set forth in the Findings of Fact. The parties are now agreed that the statutory notice of deficiency stands as to the disallowance of the commissions of Sid Deutsch, and of some other commissions, as follows: (1) A deduction in 1943 for $7,500, which is referred to in the statutory notice of deficiency, was properly disallowed. (2) A deduction in 1944 for $7,500, commissions of Sid Deutsch, and a deduction in 1944 for $1,500 for miscellaneous commissions, each deduction, which is referred to in the statutory notice of deficiency, was properly disallowed. (3) The respondent *183 properly allowed deductions in 1945 for commissions of Sid Deutsch and for miscellaneous commissions in the amounts of $7,500 and $1,500, respectively, which are referred to in the statutory notice of deficiency. (4) A deduction for commissions in the amount of $10,000, for Sid Deutsch for 1946, referred to in the statutory notice of deficiency, was properly disallowed by the respondent. (5) A deduction for commissions to Sid Deutsch for 1947 in the amount of $1,550, referred to in the statutory notice of deficiency, was properly disallowed. (6) An additional deduction in 1949 for commissions of Sid Deutsch in the amount of $19,050, referred to in the statutory notice of deficiency, was properly allowed by the respondent. The parties have agreed orally that the adjustment for 1949 in the 5 per cent commission of the sales managers amounts to $48,928.76, which represents, chiefly, commissions of salesmen chargeable to the sales managers' commissions. This stipulation represents, also, a compromise of disputes about proper accounting procedures and is in settlement of such disputes. Decisions will be entered under Rule 50.