The Barton-Gillet Company v. Commissioner.
Barton-Gillet Co. v. Commissioner
Docket No. 3486-68.
United States Tax Court
T.C. Memo 1970-157; 1970 Tax Ct. Memo LEXIS 202; 29 T.C.M. (CCH) 679; T.C.M. (RIA) 70157; June 17, 1970, Filed *202 Held: On the facts presented, the amounts paid by petitioner as compensation to its chief executive officer were unreasonable and excessive. Reasonable compensation determined. Charles G. Page, 300 Title Bldg., Baltimore, *203 Md. , for the petitioner. Arnold E. Kaufman, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: Respondent determined deficiencies in the corporation income tax of The Barton-Gillet Company for the taxable years ended December 31, 1964, 1965, and 1966 in the respective amounts of $17,271.19, $19,620.57 and $25,880.51. The sole issue for decision is whether respondent erred in determining that deductions, claimed on the petitioner's income tax return for compensation of its chief executive officer and for contributions on his behalf to a profit-sharing trust, were excessive. Findings of Fact Some of the facts were stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference. Barton-Gillet Company (hereinafter referred to as petitioner) is a corporation organized and existing by virtue of the laws of the State of Maryland. Its principal office and place of business is at 32 South Street, Baltimore, Maryland. Petitioner filed its Federal corporation income tax returns for the taxable years ended December 31, 1964, 1965, and 1966 with the district director of internal revenue at Baltimore, *204 Maryland. Petitioner was organized in 1921 by David W. Barton, Sr. (hereinafter Barton, Sr.) and George Gillet; Gillet left the company approximately 6 months after it was organized. In its early years petitioner was engaged in the business of financial printing. This included the production of stock certificates, bonds, warrants and prospectuses. In the 1930's the business was expanded to include commercial printing, which consisted of the printing of sales literature, leaflets, brochures, and such. By 1955 the company had become essentially stagnant, evidencing little growth. Gross sales for that year were $314,212.41, accompanied by an operating loss for the year of $1,471.26. Then, as now, the financial business was static. If a Baltimore firm had New York connections, its financial business went to New York. There has been little change in this business since 1955. Only local firms do their financial printing in Baltimore and most of the work has peaks and valleys depending on the number of corporate reorganizations being conducted, and the number of new issues of securities. The commercial business has always been very competitive with many firms in Baltimore producing commercial *205 literature. David W. Barton, Jr., [1] (hereinafter Barton or Barton, Jr.) was born in 1924 and has been president of petitioner since 1958. He commenced full-time employment in 1946. At that time Barton, Sr., was president. Barton originally went to St. James School in Hagerstown and left before he was a senior to join the Marines. He was in the Marines from 1943 to 1946, and went during that time to the University of North 680 Carolina for 16 months. He was called back to service for one and a half years during the Korean war and returned to petitioner in the early 1950's. In the early days petitioner had four salesmen who, along with the secretarial help, constituted the entire personnel. The four were, Barton, Sr., Gordon, Bosee, and Barton, Jr. Barton, Sr. and Gordon handled the financial accounts and Bosee and Barton, Jr. handled the commercial accounts. For some time prior to the years (1964 through 1966) here involved Baron, Sr. had been an invalid. He had retained the position of chairman of the board, but had withdrawn from active participation in the business. Gordon was unable to increase *206 the business. In 1956, Bosee had a heart attack and was forced to resign, and Barton, Jr. took over his accounts. In January of 1965, when Gordon died, Barton also took over the financial accounts. In 1958, Barton became president and secretary. Early in 1965, upon Gordon's death, he also took over the duties of treasurer. Barton has occupied the position of president-treasurer since that time. During the years 1955 through 1960, Barton was constantly trying to upgrade the kind of clients and the kind of assignments the petitioner was receiving. He extended his contacts with company executives. In addition he participated actively in a great many civic enterprises. A number of the people whom he got to know through this and other means were also trustees or members of boards of various colleges and other eleemosynary institutions. This led to an awareness of the problems of such institutions and from this developed the idea that there was an opening for a company specializing in analyzing, organizing and carrying through programs through which such institutions could communicate with the public. He felt that there was a need to interpret institutions for attracting students, corporate *207 relations, foundation relations, the whole gamut of dealing with faculties, students and constituents that the eleemosynary institution has to contend with. It was his view that for various reasons the colleges had heretofore been rather unimaginative and mundane in telling the story of their programs; that the administrators on whose shoulders the duty of handling such programs fell often found this sort of work distasteful. In this situation, Barton tried a new approach under which he undertook to teach administrators of institutions throughout the country the need for "very professional communication programs." The break-through in this "institutional business" came in 1958 or 1959 when Barton conducted an assignment from Hood College, resulting in an award for a similar assignment in 1960 from Smith College, which was then conducting a fund-raising campaign for $12,000,000. The program was successful and Smith College received the Time-Life Award given under the sponsorship of the American Alumni Council, and since that time in the period between 1960 and the end of 1966, three other clients of the petitioner have won the award as the result of the work done by it. As a result *208 of the Smith program the petitioner was given a national exposure and recognition and Barton was invited to speak in national forums on the subject of interpreting colleges in the way in which it had done for Smith. In addition to national recognition, the petitioner received awards during the 6 years at various times throughout the period from the following associations: American Alumni Council American College Public Relations Association American Institute of Graphic Arts (AIGA) Architect's Report Art Directors Club of Baltimore Art Directors Club of Denver
Art Direction Magazine The Baltimore News-Post Campus Graphics Creativity on Paper Financial World Fortune Magazine National Lithographers Association National Paper Company Contest selections (Beckett, Curtis, Gilbert, Hamiltion, Linweave, Mead, Mohawk, Sorg, Strathmore, Warren, and Whiting-Plover) New York Art Directors Club New York Society of Illustrators Show of Shows The Sunpapers Type Directors Club of New York In its business petitioner served eleemosynary institutions in two basic ways: A. One service is an appraisal planning and programming service for communications. B. *209 The other is a project basis, including planning, writing and producing interpretive materials such as a brochure, film strip or a policy statement. 681 Barton possessed the necessary contacts with eleemosynary administrators and saw a need for a thoroughly professional approach. He built up and trained a staff of assistants and continued close supervision over them. He has sold 98.2 percent of the institutional accounts for 1964, 1965 and 1966. In addition, he personally services a large number of his most important accounts throughout the performance stage. In the preparation of interpretive materials, petitioner would take on the task of interpreting, in a new way, the message that the particular institution wanted to get across to the public. In some cases, the institutions would come to petitioner saying they had a problem but in most cases it was petitioner that went to the institutions to show them that a problem existed which petitioner was in a position to solve. When petitioner would take on a particular client it would do research by reading and finding out as much as could be learned about the particular client prior to any formal discussions. After this was *210 done, petitioner's staff would confer, make an assessment, and write a specific report about what should be done. The report would make specific recommendations for improved communication techniques. Within a few weeks after the report was submitted, petitioner's staff would meet with the client to review the report. In obtaining this type of work Barton would be the principal member of petitioner who would have the initial contact with the client; this was usually with a high executive officer of the client. Once the client has agreed to allow petitioner to perform a particular assignment, the client would usually be turned over to an "account man," an employee of petitioner, who would handle the servicing of the client from that point on. It was the function of the account man to put together the program for the client. This program would be reviewed by Barton. Once the program was accepted by the client, the task of writing, designing, photographing, scheduling and cost controlling was undertaken by petitioner. Petitioner had within its employ during the years in issue trained designers and a qualified art department. Petitioner also had within its employ qualified photographers. *211 Petitioner does not do any of the actual printing involved in its business, but uses subcontractors. When Barton served in the capacity as an account man, he performed the same functions of other account men in the employ of petitioner. Petitioner would charge for its services in two basic ways. One way would be a flat fee plus expenses. The other form of charging clients would be on a cost plus basis. The cost plus arrangement would be arrived at as follows: The total direct costs of producing the project would be added together. This would include cost of supplies, art work, subcontractors, etc. Added to the total cost would be 45 percent of the total cost, representing overhead expenses. Petitioner's increasing success in this new field is reflected in the following table: Earned Surplus
Earned Surplus
Gross Sales
Before Premium
After Premium
Profit or Loss
Year
(Billed)
Payment
Payment
After Taxes
1955
$ 314,212.41
$ 1,825.32
$ (2,398.43)
[1,471.26)
1960
636,844.00
41,399.55
37,175.80
15,366.67
1961
855,740.25
62,864.78
58,641.03
23,440.20
1964
1,036,615.69
135,847.62
131,623.87
24,771.32
1965
1,003,294.03
194,886.14
145,662.39
37,175.27
1966
1,553,205.90
264,426.22
215,202.47
71,118.08
*212 [Earned surplus is stated in two columns because of the fact that on two occasions a premium was paid for stock which was retired. The figure $264,426.22 represents actual accumulated earnings before reduction by the premium payment.] From 1961 to 1966, inclusive, petitioner's gross sales (billed) were broken down as follows: Other than
Year
Financial
Financial
Total
1961
$ 513,822.91
$341,917.34
$ 855,740.25
1962
690,744.58
323,172.05
1,013,916.63
1963
656,639.12
228,483.77
885,122.89
1964
819,817.60
216,798.09
1,036,615.69
1965
810,616.91
192,677.12
1,003,294.03
1966
1,364,920.59
188,285.31
1,553,205.90 682 Included in the category Other than Financial" was petitioner's institutional sales. Approximately 85 to 90 percent of this category was composed of these institutional sales. During the years in issue petitioner's gross income, taxable income and net income after taxes as reported on its Federal income tax returns were as follows: Year
Gross Profit
Taxable Income
Net Income
1964
$432,968.45
$ 38,773.89
$26,592.05
1965
459,518.90
59,980.15
38,004.39
1966
662,878.18
133,263.09
76,215.05
*213 The outstanding capital stock of the petitioner in 1955 consisted of 389 shares of 6 percent preferred stock, without voting rights, with par value of $100 each; and 390 shares of common stock, without par value. In addition, the petitioner held 155 shares treasury common stock which it had redeemed at a premium of $4,222.75. This stock was then held as follows: Preferred Stock
Common Stock
Barton, Sr
263 shares
260 shares
Gordon
0
130 shares
Bosee
126 shares
0
In 1960, Barton, Jr. bought his father's common stock. In 1963, Bosee's preferred stock was redeemed by the petitioner. In 1964, Barton, Sr. gave his preferred stock to Barton, Jr. In 1965, following the death of Gordon, his 130 shares of common stock were redeemed by the petitioner. So that up through 1964, Barton, Jr. held two-thirds of the outstanding stock. From 1965 and thereafter he held all of the outstanding stock of the petitioner. Between 1955 through 1966 the total sum of $24,893.92 had been paid as preferred dividends - current and in default; and as of December 31, 1966, there were no such dividends in default. The petitioner periodically each year had to borrow money ranging *214 from $50,000 to something less than $100,000 for working capital. From time to time petitioner purchased short-term Treasury notes in amounts of $50,000. Barton is the president of the petitioner and has been such since 1958. The active full-time officers of the petitioner during the period 1964-1966 were: 1964
1965
1966
David W. Barton
Pres.-Sec.
Pres.-Treas.
Pres.-Treas.
William H. Gordon
Exec. Vice Pres. & Treas.
Paul W. Carre
Vice Pres.
Vice Pres.
Exec. Vice Pres.
Luther H. Hoopes
Vice Pres.
Vice Pres. *
William M. Jositis
Vice Pres.
Vice Pres.
Vice Pres.
Jan Krukowski
Vice Pres.
Vice Pres.
Vice Pres.
Edwin Gold
Vice Pres.
* Until May 31, 1965
Total compensation
$218,032.26
$198,939.30
$256,014.69
of officers These figures do not include contributions to the petitioner's profit-sharing plan. Bramble held the position of secretary from 1962 and thereafter. He is an attorney and his main duties were primarily the technical duties of a secretary which an attorney would perform. He received compensation for specific legal duties performed. Hoopes left the petitioner's employ in May 1965. Throughout the period from 1962 *215 to 1965, the directors were: Barton, Sr., Gordon, Barton, and Bramble. As previously stated Gordon died in January of 1965 and shortly after his death on February 8, 1965, the number of directors was reduced to three. The others remained in office to the present date. In 1964 petitioner employed between 15 and 20 people. This had increased in 1966 to from 20 to 25 people. Barton heads up all aspects of the business. Everyone operates under his direction and control. The officers under Barton are account men and project directors. The director of creative services is in charge of art services and the general managers are in charge of production. The general manager in New York was Jan Krukowski, who was an "account man." The executive vice president in Baltimore was Paul Carre, who was an "account man." An account man assumes responsibility of a client's account after it is assigned to him. Krukowski had one assistant account man in New York, 683 and there were two assistant account men in Baltimore under Carre. Barton handled institutional accounts personally where either he was asked to do so by the client or where the subject matter made it desirable for Barton to do so. *216 Jan Krukowski and Paul Carre did their account work under Barton's supervision. This resulted in each of them doing somewhat similar amounts of account work. In 1965, Krukowski handled about $50,000 worth of gross profits as an account man; Carre handled about $90,000 of gross profits as an account man; and Barton handled $50,000 worth of gross profits as an account man. In 1966, Krukowski handled $60,000 in gross profits; Carre $100,000 in gross profits; and Barton $90,000 to $95,000 in gross profits. Barton's duties required him to constantly travel throughout the United States and sometimes in Canada and England. Petitioner has clients in San Francisco, Denver, Florida, etc. In his selling work, he was required to address large audiences of people and he was asked from time to time to address assembled groups of people who dealt with related problems in the institutional field, and he had to make four or five major addresses a year and was constantly presenting material to such bodies of people as boards of trustees or directors. The calibre of these people required not only that he be fully prepared in his presentation but also that he be conversant with their particular situation. *217 During the years 1964 and 1965, Barton, as president, had no assistant. In 1966, an assistant to the president was appointed. Barton also made all decisions regarding financial management, including performance of duties as treasurer. He hired all key personnel and trained them, particularly in the institutional work, and was constantly watching them to determine the rate of commission which would be allowed them as an incentive. He retained close supervision of all of the accounts in the institutional work and was in constant contact with petitioner's New York office. Ever since petitioner's organization, incentive compensation of salesmen has been in the form of a commission based on a percentage of gross profit on sales. The practice has been to reserve approximately one-third of gross profits for the petitioner, and to divide the remaining two-thirds among the principals. Sometimes the commission alone was the sole compensation. In other cases, as in Barton's case, there was a small additional salary. Gross profit for purpose of fixing commissions was gross billings less total direct costs, including a charge for overhead. For the purpose of fixing the amount of these commissions, *218 the business of the petitioner was divided into "financial," which was sold and handled by Barton, Sr., and Gordon; and "other than financial," which was sold and handled by Bosee and Barton, Jr. Later when the institutional business had become important, the "other than financial" business was classified as institutional business but included commercial and other business of the petitioner, except financial. When Barton first came to petitioner he was a salesman selling commercial printing. He was paid a commission at the rate of 40 percent on the first $400 of gross profits and 50 percent on all gross profits beyond that in a given month. In the early 1950's, after Barton came out of the service, he was receiving a lesser percentage of the gross profits. In the latter part of the 1950's he was starting to assume more administrative work and in addition to his commissions he was receiving about $5,200 a year as salary. Before 1956, four persons were receiving commissions on sales: Barton, Sr. and Gordon on the institutional side, and Bosee and Barton, Jr. on the commercial side. The only two resolutions of the board of directors having to do with fixing percentage of commissions *219 were, (1) with regard to financial business on June 3, 1955; and (2) with regard to "other than financial business" on January 12, 1957. At the times when these resolutions were adopted, Barton held the office of secretary and was a director, but he owned no part of the preferred or common stock. The board of directors consisted of Barton, Sr., Bosee, Gordon and Barton. The resolution of June 3, 1955 was based on a report by Bosee and Gordon. It related to - the division of Gross Profits from financial printing between Mr. Barton, Sr., Mr. Gordon and The Company. This resolution reads in part as follows: On all such old business that Gordon services, and on all new financial printing that Gordon services, whether such new 684 business comes through Barton's efforts or Gordon's efforts, the following scale of division of the gross profits will apply from June 1, 1955: for 1955 Gordon 36 2/3 percent - for Barton 30% - for B.G. & Co. 33 1/3% for 1956 Gordon 38 2/3 percent - for Barton 28% - for B.G. & Co. 33 1/3% for 1957 Gordon 40 2/3 percent - for Barton 26% - for B.G. & Co. 33 1/3% for 1958 Gordon 42 2/3 percent - for Barton 24% - for B.G. & Co. 33 1/3% for *220 1959 Gordon 44 2/3 percent - for Barton 22% - for B.G. & Co. 33 1/3% for 1960 Gordon 46 2/3 percent - for Barton 20% - for B.G. & Co. 33 1/3% This 1960 division shall continue at the same rate as long as Barton shall live. If Barton does not live until 1960, at that time the 1960 division shall immediately go into effect, except that Barton's 20% shall go to the Company, making the division Gordon 46 2/3%, The Barton-Gillet Company 53 1/3. It was then agreed that an understudy should be named for Gordon. The minutes then continue: It seems logical and proper that the person to fill this role should be Barton, Jr. The compensation for Barton, Jr., during this learning period for work done on this financial printing shall be mutually agreed upon as fair and proper between the parties concerned - that is Barton, Sr., Gordon, Barton, Jr., and the Company. It is also understood that during this learning period Gordon shall afford Barton, Jr. every opportunity to learn this particular type of business, including contracts, sitting in on conferences, as well as direct imparting of knowledge and information by Gordon, and any thing else that may be helpful to Barton, Jr. When Barton, *221 Jr. demonstrates satisfactorily to all concerned his ability to handle this work, and does actually handle a portion of it, there shall then be worked out an arrangement based on the above scale, or modification thereof, that shall be fair and satisfactory to all concerned. It is understood that any such future arrangement shall not affect the constant minimum percentage of the Company, which is established at 33 1/3% of the gross profit. After a full discussion it was upon motion duly made and seconded, unanimously: RESOLVED, that the report and recommendations set forth above be accepted and adopted as written and that all members of the Board of Directors indicate their acceptance by signing these minutes. The meeting of the board of directors on January 12, 1957 was also attended by the full board, to wit, Barton, Sr., Bosee, Gordon and Barton, Jr. A resolution first noted the resignation of Bosee as an officer of the petitioner "as of December 31, 1956." After other discussion relating to Bosee, the minutes continue as follows: Mr. Barton, Jr. then advised the meeting that he would like the approval of a plan he had worked out to service Mr. Bosee's accounts effective *222 as of January 1, 1957, as follows: His plan is to pool Mr. Bosee's accounts with his own and divide the servicing of all such accounts between himself, Messrs. Carre and Beehler and to divide the gross profits on all such accounts, 30% to himself, 10% to Mr. Carre and 10% to Mr. Beehler, leaving 50% to take care of the overhead and the net profits of the Company. After some discussion the following motion was made, duly seconded and passed: RESOLVED, that Mr. Barton, Jr. plan to pool Mr. Bosee's accounts with his own and to divide the servicing of all such accounts as he deemed best between himself, and Messrs. Carre and Beehler, and to be compensated for such service through receiving 30% of the gross profit for himself, 10% to Mr. Carre and 10% to Mr. Beehler effective on all orders from these sources and from new accounts of Messrs. Carre & Beehler billed on or after January 1, 1957, subject to change by action of the Board of Directors. Here there was some discussion regarding commissions on financial accounts culminating with the adoption of the following resolution: RESOLVED, effective as of January 1, 1957, that all accounts serviced by Mr. Gordon and by Mr. Barton, *223 Sr. be pooled and that hereafter Mr. Gordon receive 40% and Mr. Barton, Sr. receive 20% of the gross profits on all such pooled orders billed after January 1, 1957. Mr. Gordon and Mr. Barton, Sr. then advised the Board that due to changes and responsibilities being assigned to certain officers and employees that the salary scale currently in effect should be changed and they submitted a schedule of such changes which they recommended be adopted by the Board. After a great deal of discussion Mr. Barton, Sr. pointed out that, while he was in favor of the recommendations as submitted that their acceptance by the Board would materially increase the fixed overhead of the Company, and that any action taken at this meeting might have 685 to be reconsidered at a future date, if it was found that the profits of the Company and its need for additional working capital was adversely affected, and after further discussion a motion was made, seconded and duly passed: RESOLVED, effective as of January 1, 1957, that the officers and employees of the Company be compensated in accordance with the memorandum submitted by Messrs. Gordon and Barton, Jr. and the memorandum be spread upon these *224 minutes and become a part of this resolution, it being understood that if in the judgment of the Board of Directors of the Company, the scale of compensation set forth in this resolution adversely affected the finances of the Company that the Board of Directors reserve the right to make such changes that it deemed desirable or necessary. MEMORANDUM Mr. Barton, Sr. is to receive $5,200.00 annual salary payable on a weekly basis, plus 20% of the gross profits of all D.W.B.'s and Wm. H. Gordon's orders. * * * The foregoing compensation arrangement is effective as of January 1, 1957, applicable to all orders billed after that date. Barton, Jr.'s salary was raised to $300 per week at a meeting on January 19, 1962. The minutes of this meeting also contained a paragraph reading as follows: The Board then considered and fully discussed the matter of declaring a dividend on the Common Stock. In view of the increase in the business of the Corporation, which requires substantial working capital, and in order to have available adequate working capital for the Corporation's increasing business, it was the consensus of the Board that it would be inadvisable to declare a dividend on the *225 Common Stock at this time. The only other minutes with regard to compensation affecting Barton was a notation at a special meeting of the board held on February 11, 1963, reading as follows: There followed a discussion with respect to the compensation of the President and Executive Vice President for their managerial and other administrative services and duties. The Board felt that for many years past and at the present time the President and Executive Vice President had not been and were not being adequately compensated for their extensive managerial and administrative services, but that in view of the nature of the business of the Company these Officers could not be paid the real value of such services. However, there was a consensus of opinion of the Board that the services of each of these Officers, exclusive of their services in the sales area, have a value of not less than $50,000.00 and that if and when conditions of the business should warrant it they should be compensated for their managerial and administrative services on that basis. As of January 1, 1960, petitioner established a profit-sharing trust which was duly approved by the Internal Revenue Service under section 401, Internal Revenue Code *226 of 1954. [2]
Contributions to the trust for the years in issue were as follows: 1964
$48,198.66
15 employees
1965
37,912.33
15 employees
1966
53,889.33
20 employees
Amounts allocated to Barton for these years were as follows: 1964
$13,876.35
1965
13,164.00
1966
16,672.52
Certain employees of the petitioner were compensated on a commission basis. It appears that Barton was solely responsible, during the years in issue, for determining the percent of these commissions. Barton also had sole control over the amount of his own commissions, within the limit of 30 percent of institutional gross profit as imposed by the board of directors. He could arbitrarily diminish his commission but without the consent of the board could not raise it beyond the aforementioned 30 percent. Barton retained the established policy of having petitioner retain one-third of its gross profits from institutional sales. During the years in issue Barton received approximately 28 percent of petitioner's gross profits from institutional sales. The percentage that *227 each employee would receive was based upon the gross profits of petitioner from institutional sales and not on the percent of each employee's sales. Under petitioner's method of paying contingent compensation there is no direct relationship to sales completed or work performed by an individual employee. An account was maintained for each employee of petitioner who was receiving this type of contingent compensation. Petitioner's accountant would credit these accounts 686 monthly with the amount of a particular employee's commission. After deductions for withholding tax, etc., were made the employee could draw against his account. For the years in issue Barton would direct petitioner's accountant to credit his account with a commission of approximately 22 percent. He had the remainder, approximately 6 per cent, credited to a reserve account. It was Barton's hope that this money could be used to compensate a prospective employee who could take over part of Barton's duties. When, in each of the years in issue, no such employeee was hired, the money was returned to Barton's account and he ultimately received it at the end of the year. During the years from 1960 to 1966 the highest *228 paid employees of petitioner received compensation as follows: 1960
1961
1962
1963
David W. Barton, Jr.
$39,443.78
$53,251.48
$74,121.61
$77,022.41
William H. Gordon
39,111.75
57,165.04
60,874.17
48,003.93
Paul D. Carre
17,831.86
21,649.33
25,483.28
25,449.20
Jan Krukowski
9,994.49
Edwin Gold
7,631.62
10,819.49
13,308.01
13,274.30
Matthew J. Welsh
9,932.50
Luther H. Hoopes
16,129.66
19,191.72
22,990.28
23,198.26
William M. Jositis
7,666.75
11,854.91
14,678.09
13,858.72
H. Thomas Adams
15,650.00
Fred Worthington
1,890.00
7,525.97
1964
1965
1966
David W. Barton, Jr.
$82,488.08
$87,567.11
$111,123.39
William H. Gordon
46,958.84
7,927.71
Paul D. Carre
31,336.93
35,746.17
44,408.66
Jan Krukowski
18,809.69
23,264.45
32,469.41
Edwin Gold
16,091.62
19,348.80
26,759.18
Matthew J. Welsh
11,250.00
16,485.58
17,872.10
Luther H. Hoopes
23,733.43
8,474.48
William M. Jositis
14,705.29
16,735.58
23,381.95
H. Thomas Adams
Fred Worthington
11,987.25
12,255.15
14,705.85
The above tabulation does not include the interest of employees in the Company's contributions *229 to its Profit Sharing Plan. In the case of Barton he received a salary of $15,000 in each of the years in issue. This amount is included in the above chart. In its corporation income tax returns for 1964, 1965, and 1966 petitioner claimed deductions for compensation paid to Barton and for contributions on his behalf to the aforementioned profit-sharing trust as follows: Non-deferred
Deferred
1964
$ 82,488.08
$13,876.35
1965
87,567.11
13,164.00
1966
111,123.39
16,672.52
In its notice of deficiency, dated April 15, 1968, respondent determined that reasonable deferred and non-deferred compensation for Barton for the years 1964, 1965, and 1966 was $60,000, $60,000 and $75,000, 687 respectively, thereby disallowing petitioner's deductions in the following amounts: Non-deferred
Deferred
1964
$31,128.08
$4,669.21
1965
35,408.11
5,311.22
1966
45,908.39
6,886.26 The discrepancies in each of the years in question between the total amounts deducted on the petitioner's returns as non-deferred and deferred compensation and the total amounts that respondent allows and disallows are not explained. However, such discrepancies are *230 not relevant to our conclusion. Ultimate Findings of Fact 1. Compensation paid Barton during each of the years in issue was unreasonable and excessive. 2. Reasonable compensation, including both direct and indirect, due Barton for the years 1964, 1965 and 1966 is $80,000, $83,000 and $108,000, respectively. Opinion Section 162(a)(1) provides that in computing its taxable income a corporation shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The sole question presented for our decision is whether the amounts paid as compensation by the petitioner corporation to its chief executive officer and controlling shareholder [3] were reasonable under the terms of section 162(a)(1) and, therefore, deductible. We would of course agree that *231 a controlling shareholder executive is entitled to be as well paid as a comparable executive of a publicly owned corporation. But this is not to say, where the controlling shareholder sets his own compensation as an executive, that the reasonableness of such compensation does not require a second look by reason of the obvious lack of arms-length bargaining. Miles-Conley Co. v. Commissioner 173 F. 2d 958, 960 (C.A. 4, 1949), affirming 10 T.C. 754 (1948). Petitioner compensated Barton for his services in three ways. He was paid a fixed salary of $15,000 per annum during each of the years in issue. In addition, he received contingent compensation in the form of approximately 28 percent of petitioner's gross profits from so-called institutional sales. And finally petitioner contributed $13,876.35, $13,164.00, and $16,672.52 for 1964, 1965, and 1966, respectively, to Barton's account in a qualified profit-sharing trust as deferred compensation. We note this troika for the purpose of stating that we must consider Barton's deferred and nondeferred compensation together *232 in order to determine if compensation as a whol is reasonable. Charles E. Smith & Sons, Co. v. Commissioner, 184 F. 2d 1011, 1014 (C.A. 6, 1950), affirming sub. nom. Hall C. Smith, 11 T.C. 174 (1948); section 1.404(a)-1(b), Income Tax Regs.
The burden of proving reasonableness is upon petitioner, Botany Worsted Mills v. United States, 278 U.S. 282 (1929), and the question is one of fact to be determined from all the facts and circumstances of the particular case. Boyle Fuel Co., 53 T.C. 162, 169 (1969). As stated in Mayson Manufacturing Company, 178 F. 2d 115, 119 (C.A. 6, 1949) the relevant facts and circumstances may be summarized as follows: Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of *233 compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * Unfortunately the application of such of the factors set forth above as are here present does not lead to an easy solution. We start with the major premise that Barton is demonstrably a man of unusual talents. On his own he developed an approach which could be used with great success by eleemosynary institutions in improving their images and in explaining their purposes and goals to the general public. Through his personal efforts he developed the necessary contacts with the policy 688 makers of various eleemosynary institutions. He possessed the salesmanship ability to induce said institutions to try this new approach. Finally, he oversaw the work done on behalf of each client. The work itself required a great deal of creative thinking. The result of the foregoing was that petitioner's "Other than Financial" sales increased from $513,822.91 in 1961 to $1,364,920.59 in 1966. During this same period of time *234 Barton's direct compensation was increased from $53,251.48 in 1961 to $111,123.39 in 1966. We note that the compensation of the three other employees who were employed during the same period increased roughly in the same proportion. The above noted increases were in line with petitioner's policy to compensate some employees on a contingent basis as a means of supplying incentive. This argues in favor of the reasonableness of Barton's compensation. Yet its significance is limited when his remuneration is compared to the others. Further, we are not impressed with the argument that a sole shareholder can pay himself incentive compensation. City Chevrolet Co. v. Commissioner, 228 F. 2d 894 (C.A. 4, 1956) affirming a memorandum decision of this Court; Irby Construction Co. v. United States, 290 F. 2d 824 (Ct. Cl. 1961). In support of its position that the compensation paid Barton was reasonable, petitioner calls our attention to section 1.162-7 (b)(2), Income Tax Regs., which states that "if contingent compensation is paid pursuant to *235 a free bargain between the employer and the individual," then it will be allowed as a deduction even though the amount "may prove to be greater than the amount which would ordinarily be paid." Unfortunately for petitioner this regulation is of no avail since Barton's dominant stockholding position makes it difficult to categorize his compensation negotiations with petitioner as resulting in a "free bargain." In appraising the reasonableness of Barton's salary we are disturbed by two things. First is the relationship of the compensation to gross profit and taxable income in the years at issue. Gross Profit
Barton's Total
Compensation Income
1964
$432,968.45
$ 96,364.43
$ 38,773.89
$ 26,592.05
1965
459,518.90
100,731.11
59,980.15
38,004.39
1966
662,878.18
127,795.91
133,263.09
76,215.05 Thus, we find that Barton's aggregate compensation, direct and indirect, was 22, 21.7 and 19 percent of gross profit for the years 1964, 1965 and 1966, respectively. Furthermore, over the period 1964-1966 Barton received as compensation, directly or indirectly, almost 60 percent of petitioner's income available for distribution after payment of all expenses *236 other than his remuneration. These relationships indicate that he was receiving excessive compensation. Kerrigan Iron Works, Inc., 17 T.C. 566, 575 (1951). Secondly, we are disturbed by the failure of petitioner to pay any dividends with respect to its common stock. The amount of dividends paid with respect to the preferred stock was insignificant. As was said in Pacific Grains, Inc. v. Commissioner, 399 F. 2d 603, 607 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court: The failure of the taxpayer to pay any dividends while radically increasing the compensation of its sole shareholder is particularly significant * * * as is the lack of any showing by the taxpayer that the duties of Rodgers had significantly changed from the fiscal year in which he was paid a total compensation of $29,000. See also Miles-Conley Co. v. Commissioner, supra. While Barton was entitled to be well rewarded, a degree of commensurate recognition should also be given to the contributors of capital. Obviously in a service-type corporation like the petitioner such contribution does not deserve the recognition that it should receive in a manufacturing *237 corporation, but that is no reason to justify its being totally ignored. We appreciate petitioner's difficulty in securing evidence with respect to amounts paid to executives of comparable companies. Petitioner's business does have unique qualities. However, no attempt was even made to present evidence of the compensation practices of corporations of comparable size and capital structure; information which was certainly available to petitioner. Petitioner did present, at trial, an expert witness who set forth a complex method of comparing 689 compensation. This witness, however, neglected most of the factors relied on in the past by this Court as well as other courts. Hence, its probative value in the case is rather meager. Pacific Grains, Inc. v. Commissioner, supra, at 607. After having thoroughly considered the evidence in the instant case in the light of the factors as set forth by the decided cases in the area, we conclude that during the years in question petitioner paid unreasonable and excessive compensation to Barton. Part of the amounts paid him, in fact, represented the payment of dividends and accordingly is not deductible. We recognize the value *238 of Barton's services to the petitioner. As we have noted he was largely responsible for petitioner's success. For this reason, as well as for reasons stated in our findings of fact, we cannot accept undisturbed the respondent's determination as to what constitutes reasonable compensation. We attempt the delineation of reasonable compensation secure in the knowledge that we are not bound to fix the amount with mathematical precision. Jones Brothers Bakery, Inc. v. United States, 411 F. 2d 1282, 1294 (Ct. Cl. 1969). Accordingly, based on our findings of fact we find that reasonable compensation, both direct and indirect, for 1964, 1965 and 1966 would aggregate $80,000, $83,000 and $108,000, respectively. Decision will be entered under Rule 50. Footnotes
1. It is the reasonableness of Barton's compensation that is at issue here.↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
3. During 1964 Barton held 66 2/3 percent of the petitioner's outstanding stock and in 1965 and 1966 he was petitioner's sole shareholder.↩